844 A.2d 1162

STATE of Maryland

v.

Shirley R. BROOKINS, Steven P. Martin, and Rashida S. Hogg.

No. 19, Sept. Term, 2003.

Court of Appeals of Maryland.

March 16, 2004.

348

West Codenotes

**Held Unconstitutional**

West's Ann.Md.Code, Election Law, § 13–245

---

Thomas M. McDonough, Sr. Asst. State Prosecutor (Stephen Montanarelli, State Prosecutor, Towson), Robert A. Zarnoch, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, Robert N. McDonald and Kathryn M. Rowe, Asst. Attys. Gen., Annapolis), all on brief, for appellant.

Larry Allen Nathans (Booth M. Ripke of Bennett & Nathans, LLP, Baltimore), on brief, for appellees.

Deborah A. Jeon, Baltimore, Arthur B. Spitzer, Washington, DC, brief of The American Civil Liberties Union of the National Capital Area and The American Civil Liberties Union of Maryland, as amici curiae for appellees (Not admitted in Maryland).

David Rocah, American Civil Liberties Union of Maryland Foundation, Baltimore, of counsel (Not admitted in Maryland).

Argued before BELL, C.J., ELDRIDGE,* RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA JJ.

BELL, Chief Judge.

■ The issue this case presents is whether the Maryland "walk around services" statute, codified during the relevant time period at Maryland Code (1957, 2002 Replacement Volume), Article 33, § 13–209,[1] which prohibits both a candidate and a candidate's campaign from paying for "walk around

---

\* Eldridge, J. now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Maryland Code (1957, 2002 Replacement Volume), Article 33, § 13–209 was revised and recodified, as a part of the Code Revision process, without substantive change, by Acts of 2002, ch. 291, effective January 1, 2003. It now appears in the Maryland Code (2003) § 13–245 of the Election Law Article. Unless otherwise indicated, future references will be to Art. 33, the statute in effect when the alleged violations occurred.

The criminal penalty for a violation of § 13–209 was prescribed in § 13–603. It provided:

"(a) *In general.*—Except as provided in § 13–601 of this title, any person who knowingly and willfully violates any of the provisions of this title is guilty of a misdemeanor, and upon conviction shall be fined not more than $25,000.00, or be imprisoned for not more than 1 year or both, in the discretion of the court.

"(b) *Application of specific penalties.*—If a different penalty is specifically prescribed for violation of any section of this subtitle and expressly set forth therein, the specific penalty applies and the penalty set forth in this section does not apply."

The indictments refer to both § 13–209 and § 13–603. Because the latter simply prescribes the criminal penalty for violation of § 13–209, the former is the substantive provision. Therefore, hereinafter, unless otherwise indicated, any reference to the applicable statute is to § 13–209.

services or any other services as a poll worker or distributor of sample ballots, performed on the day of election" and any person from receiving payment in any form for such services, unconstitutionally violates the freedom of speech, as guaranteed by the First Amendment to the Constitution of the United States.[2]

## I. Facts

As relevant, § 13–209 provided:

"13–209. 'Walk Around Services'.

"(a) Prohibited.—No candidate, slate of candidates, political committee, political party, or any person acting on behalf of any of the foregoing, may at any time, directly or indirectly pay, or incur any obligation to pay, nor may any person receive, directly or indirectly any sum of money or thing of value in return for a political endorsement or for 'walk around services' or any other services as a poll worker or distributor of sample ballots performed on the day of election.

---

**2.** This is the question that the State presented in its petition for certiorari. The respondents, however, have argued that " § 13–209 and new Election Law § 13–245 . . . violate the First Amendment to the United States Constitution and Art. 40 of the Md. Declaration of Rights." We adopt the position Judge Eldridge delineated for this Court in *The Pack Shack, Inc. v. Howard County,* 377 Md. 55, 64, 832 A.2d 170, 176 (2003):

"This Court has often 'treated Art. 40 [of the Maryland Declaration of Rights] as being *in pari materia* with the First Amendment' and has stated that the 'legal effect of' both provisions 'is substantially the same,' *Sigma Delta Chi v. Speaker,* 270 Md. 1, 4, 310 A.2d 156, 158 (1973). *See DiPino v. Davis,* 354 Md. 18, 43–44, 729 A.2d 354, 367–368 (1999). "Nevertheless, we have also emphasized that, simply because a Maryland constitutional provision is *in pari materia* with the federal one . . . does *not* mean that the provision will *always* be interpreted or applied in the same manner as its federal counterpart." *Dua v. Comcast Cable,* 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002). *See also DiPino v. Davis, supra,* 354 Md. at 43, 729 A.2d at 367 ("[I]n certain contexts the contours of the State Constitutional rights are not precisely those of the Federal"). In light of the facts and arguments in the case at bar, however, we shall regard the claimed violation of Article 40 and the claimed violation of the First Amendment as a single issue."

"(b) 'walk around services' defined—For the purpose of this section 'walk around services' include any of the following activities when performed for money on the day of the election while the polls are open:

"(1) Distributing to any person any item enumerated in 13–602 of this title;

"(2) Communicating a voting preference or choice in any manner;

"(3) Stationing any person or object in the path of any voter; or

"(4) Electioneering or canvassing within the meaning of § 16–206 of this article.

"(C) Exceptions.—This section does not apply to:

"(1) Meals, beverages, and refreshments served to campaign workers;

"(2) Salaries of regularly employed personnel in campaign headquarters;

"(3) Media advertising including but not limited to newspaper, radio, television, billboard, or aerial advertising;

"(4) Rent and regular office expense or

"(5) Cost of phoning voters or transporting voters to and from polling places."

\* \* \* \*

On November 5, 2002, Maryland held its general election for, *inter alia*, the offices of Governor and Lieutenant Governor. Shirley R. Brookins, Steven P. Martin and Rashida S. Hogg, the respondents, were charged, by indictment, in the Circuit Court for Prince George's County, with violating § 13–209, respondent Brookins by paying for walk around services provided by third parties on election day, and respondents Martin and Hogg by conspiring to violate the section and incurring an obligation to pay for walk around services provided on election day. More particularly, the State of Maryland, by the State Prosecutor, the petitioner, alleged that respondent Brookins, the operator of a temporary employment agency in the District of Columbia, used campaign funds of the

Republican nominees for Governor and Lieutenant Governor (hereinafter referred to as "Ehrlich/Steele") to hire and pay approximately 200 residents of a homeless shelter located in the District to provide walk around services on the general election day; that she transported them to the polls, where those walk around services, i.e. accosting voters outside the polls, communicating a voting preference, and distributing Ehrlich/Steele campaign literature, were performed; and for which the respondent Brookins paid each worker the following day. The State alleged that respondents Martin and Hogg, hired Maryland residents, mostly high school and college students, and offered them cash amounts ranging from $80.00 to $110.00 to render walk around services on the day of the election, including distributing Ehrlich/Steele campaign materials, communicating to voters accosted outside the polls a voting preference and advocating for the election of Robert Ehrlich for Governor and Michael Steele for Lieutenant Governor.

The respondents filed in the Circuit Court for Prince George's County, Motions to Dismiss the indictments on the grounds that § 13–209 was unconstitutional in that it violated their First Amendment free speech rights both on its face and as applied in this case.[3] The Circuit Court granted the respondents' motions, holding "§ 13–209 is facially unconstitutional" and, thus, violative of the First Amendment guarantee of freedom of speech. Specifically, the court concluded that the State's enunciated interest in curtailing the appearance of "undue influence and vote buying" was not so compelling or of sufficient "magnitude to warrant the curtailment of the Defendants' (and all others) freedom of speech. . . ." Pointing out

---

3. The respondent Brookins, in both her motion to dismiss and the supporting memorandum, additionally argued that § 13–209 was both, unconstitutionally vague and over-broad, in violation of the First Amendment and Art. 40 of the Maryland Declaration of Rights. In a separate motion, the respondent Martin moved to dismiss on the basis that the statute was unconstitutional on its face and as applied to him, citing both the United States Constitution and Art. 40 of the Maryland Declaration of Rights. The respondent Hogg adopted the reasons and arguments of her co-counsel and Amici.

that "Maryland already has a statute that addresses vote buying (§ 16–201)" and, thus, provides a remedy for the actions targeted by § 13–209, the Court also was of the view that the statute "lack[ed] detailed parameters" and, in any event, was not sufficiently narrowly tailored to meet the compelling State interest. Having determined that the statute was facially unconstitutional, the court declined to address the other issues raised in the case, including its constitutionality under the State Constitution.

The State timely noted an appeal to the Court of Special Appeals and, simultaneously, filed with this Court a Petition for Writ of Certiorari. We issued the writ of *certiorari* before there were any proceedings in the intermediate appellate court. *State v. Brookins,* 374 Md. 582, 824 A.2d 58 (2003).

On appeal, the respondents argued that, because the measure limits speech, the determination of whether it meets constitutional muster turns on the time-honored test of whether the State law is "narrowly tailored to meet a compelling state interest" to survive strict scrutiny. With regard to that standard, the respondents asserted that § 13–209 is unconstitutional because it neither enunciates a compelling state interest nor is sufficiently narrowly-tailored, and, thus, it impermissibly violates their right to freedom of speech guaranteed by the First Amendment of the United States Constitution.

The State argued that § 13–209 is constitutional. In support of its position, the State first argued that this Court should not apply strict scrutiny in its analysis of whether or not § 13–209 is unconstitutional. To the contrary, the State asserted that we should employ a less stringent standard because the provision is, at its heart, about the conduct of spending money, and only incidentally affects speech. The State alternatively argued that the provision is constitutional even under the strict scrutiny analysis because 1) the law was enacted to meet a compelling state interest, "to prevent real or apparent corruption of the electoral process", and 2) the provision was narrowly tailored to accomplish that objective.

Following oral argument, the Court issued, on September 4, 2003, an Order affirming the judgment of the Circuit Court, with the reasons therefor to be set forth in an opinion to follow. *State v. Brookins,* 376 Md. 697, 831 A.2d 453 (2003). We now give our reasons.

## II.

The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech...." " That right, "among the fundamental personal rights and liberties[, is] secured to all persons by the Fourteenth Amendment against abridgement by a State." *Thornhill v. Alabama,* 310 U.S. 88, 95, 60 S.Ct. 736, 740, 84 L.Ed. 1093, 1098 (1940). "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659, 685 (1976). Accordingly, as the Supreme Court has recognized, "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco Cty. Democratic Central Comm.,* 489 U.S. 214, 223, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271, 282 (1989) (quoting *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35, 41 (1971)). Further, [t]he First Amendment affords the greatest protection to political expression in order " 'to assure the unfettered exchange of ideas for the bringing about of political and social changes desired by the people.' " *Buckley,* 424 U.S. at 14, 96 S.Ct. at 632, 46 L.Ed.2d at 685 (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498, 1506 (1957)). The *Buckley* Court continued:

"Although First Amendment protections are not confined to 'the exposition of ideas,' *Winters v. New York,* 333 U.S. 507, 510, [68 S.Ct. 665, 668, 92 L.Ed. 840, 847] (1948), 'there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs ... of course includ(ing) discussions of candi-

dates.... ' *Mills v. Alabama,* 384 U.S. 214, 218, [86 S.Ct. 1434, 1437, 16 L.Ed.2d 484, 488] (1966). This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open,' *New York Times v. Sullivan,* 376 U.S. 254, 270, [84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701] (1964). In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we must follow as a nation."

*Buckley,* 424 U.S. at 14–15, 96 S.Ct. at 632, 46 L.Ed.2d at 685. *See also McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347, 115 S.Ct. 1511, 1518–19, 131 L.Ed.2d 426, 439–440 (1995) (noting that no form of speech is entitled to greater constitutional protection than political speech); *Burson v. Freeman,* 504 U.S. 191, 196, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5, 12–13 (1992); *Meyer v. Grant,* 486 U.S. 414, 421, 108 S.Ct. 1886, 1891, 100 L.Ed.2d 425, 434 (1988). *See also, Eanes v. State,* 318 Md. 436, 445, 569 A.2d 604, 608 (1990) (holding that "[t]he 'freedom to think as you will and to speak as you think' is a 'means indispensable to the discovery and spread of political truth' and is essential both to 'stable government' and to 'political change.' " (quoting *Whitney v. California,* 274 U.S. 357, 375–77, 47 S.Ct. 641, 648–49, 71 L.Ed. 1095, 1105–06 (1927))).

 "When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. at 347, 115 S.Ct. at 1519, 131 L.Ed.2d at 440. *See Meyer v. Grant,* 486 U.S. at 423, 108 S.Ct. at 1893, 100 L.Ed.2d at 436; *Burson v. Freeman,* 504 U.S. at 197, 112 S.Ct. at 1850, 119 L.Ed.2d at 13 (1992). *Meyer v. Grant* makes clear that petition circulation is "core political speech" for which the First Amendment protection is "at its zenith." 486 U.S. at 425, 108 S.Ct. at 1894, 100 L.Ed.2d at 438. The Supreme Court has also recognized, as we have seen, that "the constitutional guarantee has its fullest

and most urgent application precisely to the conduct of campaigns for political office," *Monitor Patriot Co. v. Roy,* 401 U.S. at 272, 91 S.Ct. at 625, 28 L.Ed.2d at 41, and that "[a]dvocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation." *Buckley,* 424 U.S. at 48, 96 S.Ct. at 648, 46 L.Ed.2d at 704. Consequently, the actions that make up the walk around services that § 13–209 proscribes on election day are no less "core political speech."

Particularly, where a statute restricts or burdens political speech, the State has the burden of showing that there is a sufficiently compelling reason, unrelated to the content of the speech, for enacting the legislation. *Burson,* 504 U.S. 191, 196–98, 112 S.Ct. 1846, 1850–51, 119 L.Ed.2d 5, 12–15 (1992). Furthermore, the State must prove that the statute is narrowly tailored to effectuate that compelling interest and is "the least restrictive means to further the articulated interest." *Id., U.S. v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 1887, 146 L.Ed.2d 865, 879 (2000) (quoting *Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93, 105 (1989)); *State v. Sheldon,* 332 Md. 45, 53, 629 A.2d 753, 758 (1993). Stated differently, the State's burden is met if it establishes that the statute remedies the conduct aimed at without excessively abridging the speech of those not engaged in the targeted action. *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.,* 479 U.S. 238, 265, 107 S.Ct. 616, 631, 93 L.Ed.2d 539, 561 (1986).

In *Meyer v. Grant, supra,* a case factually similar to the one at bar, at issue was the constitutionality of Colo.Rev.Stat. § 1–40–110 (1973),[4] which prohibited the use of paid petition

---

4. Colorado Rev. Stat. § 1–40–110 (1980) provides:

"Any person, corporation, or association of persons who directly or indirectly pays to or receives from or agrees to pay to or receive from any other person, corporation, or association of persons any money

circulators. Section 1–40–110, which made it a felony to pay petition circulators to obtain the requisite number of signatures, *id.* at 417, 108 S.Ct. at 1889, 100 L.Ed.2d at 431, was one of the provisions of a State law that permitted voters to place propositions, i.e. proposals for new laws or amendments to the Constitution, on the ballot through an initiative process, so long as they were able to obtain the signatures of at least five percent of the qualified voters on an initiative petition within a six-month period. *Id.,* 486 U.S. at 416, 108 S.Ct. at 1889, 100 L.Ed.2d at 431. The appellees, proponents of an amendment to the state constitution, paid individuals to help obtain enough signatures to have their proposed amendment placed on the ballot and were subsequently charged with violating the State law. The United States District Court for the District of Colorado held that the statute was constitutional, *id.* at 418–19, 108 S.Ct. at 1890, 100 L.Ed.2d at 432–33, and the Circuit Court of Appeals for the 10th Circuit, sitting *en banc,* reversed,[5] *id.* at 419, 108 S.Ct. at 1890–91, 100 L.Ed.2d at 433, holding that

"the effect of the statute's absolute ban on compensation of solicitors is clear. It impedes the sponsors' opportunity to disseminate their views to the public It curtails the discussion of issues that normally accompanies the circulation of initiative petitions. And it shrinks the size of the audience that can be reached. . . . In short, like the campaign expen-

or other thing of value in consideration of or as an inducement to the circulation of an initiative or referendum petition or in consideration of or as an inducement to the signing of any such petition commits a class 5 felony and shall be punished as provided in section 18–1–105, C.R.S. (1973)."

**5.** Initially, a divided panel of the Court of Appeals affirmed the judgment of the trial court for the reasons given by the trial court: the prohibition against the use of paid circulators did not burden appellees' First Amendment rights because they remained free to use their money to employ other spokesmen who could advertise their cause and because any burden on their political speech was justified by the State's interests in ensuring that an initiative measure has a sufficiently broad base of support and in protecting the integrity of the initiative process against the padding of petitions. *Meyer v. Grant,* 486 U.S. 414, 419, 108 S.Ct. 1886, 1890, 100 L.Ed.2d 425, 433.

diture limitations struck down in *Buckley,* the Colorado statute imposes a direct restriction which 'necessarily reduces the quantity of expression.' "

*Id.* (quoting *Grant v. Meyer,* 828 F.2d 1446, 1453–1454 (10th Cir.1987) quoting *Buckley v. Valeo,* 424 U.S. 1, 19, 96 S.Ct. 612, 634, 46 L.Ed.2d 659, 687 (1976)). Furthermore, the Appellate Court rejected the State's justifications of the measure: "to prevent fraud or to protect the public from circulators that might be too persuasive", *id.* at 420, 108 S.Ct. at 1892, 100 L.Ed.2d at 434, and "to assure that [an initiative] had a broad base of public support." *Id.*

The Supreme Court agreed with the Court of Appeals. As an initial matter, it concluded that the provision prohibiting the use of paid petition circulators was "a limitation on political expression subject to exacting scrutiny." *Id.* at 420, 108 S.Ct. at 1891, 100 L.Ed.2d at 434. That is so, the Court explained, because

> "[t]he circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech."

*Id.* at 421–22, 108 S.Ct. at 1891–92, 100 L.Ed.2d at 434–35. (footnotes omitted). Thus, the Court said, the issue the appellees championed was a "matter of societal concern that appellees have a right to discuss publicly without risking criminal sanctions." *Id.* at 421, 108 S.Ct. at 1891, 100 L.Ed.2d at 434 (citing *Thornhill v. Alabama,* 310 U.S. at 101–02, 60

S.Ct. at 744, 84 L.Ed. at 1101–02 ("The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment")). The Court concluded:

> "The refusal to permit appellees to pay petition circulators restricts political expression in two ways: First, it limits the number of voices who will convey the appellee's message and the hours they can speak and, therefore limits the size of the audience they can reach. Second, it makes it less likely that the appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion."

*Id.* at 422–23, 108 S.Ct. at 1892, 100 L.Ed.2d at 435–36.

The Court rejected the appellant's contention that the statute was not overly burdensome because it allowed the appellees other means of political speech:

> "That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection. Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. That it leaves open 'more burdensome' avenues of communication, does not relieve its burden on First Amendment expression. The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing."

*Id.* at 424, 108 S.Ct. at 1893, 100 L.Ed.2d at 436 (citations omitted). Nor was the Court persuaded that the Colorado statute was justified by the compelling government interest proffered, to "protect the integrity of the electoral process." It explained:

> "[W]e are not prepared to assume that a professional circulator—whose qualifications for similar future assignments

may well depend on a reputation for competence and integrity—is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot."

*Id.* 486 U.S. at 426, 108 S.Ct. at 1894, 100 L.Ed.2d at 438. The Court further declined to accept the State's argument that the Colorado statute was narrowly tailored to effectuate its stated interest, holding that the State had not proven that it was necessary to inhibit the appellees' exercise of expression in order to maintain the integrity of the initiative process. *Id.* at 426–27, 108 S.Ct. at 1894–95, 100 L.Ed.2d at 438. To the contrary, the Court concluded that portions of the Colorado initiative statute, including those that made it a crime to "forge a signature on a petition", Colo.Rev.Stat. § 1–13–105 (1980), to make false or misleading statements relating to a petition, Colo.Rev.Stat. § 1–40–119 (Supp.1987), or to pay someone to sign a petition, Colo.Rev.Stat. § 1–40–110, more adequately dissuaded paid petition circulators from subverting the integrity of the petition initiative process than did the provision at issue. *Id.*

In the case *sub judice,* the State submits that "[t]his is not a case about speech-it is a case about money," which, in addition to being able to be used to hire laborers, can be used to corrupt. Section 13–209, it contends, limits the use on money and only incidentally affects or restricts speech and therefore, is not subject "to the full measure of First Amendment protection that a direct restriction on speech would receive." Therefore, the State asserts (quoting *Buckley,* 424 U.S. at 19, 96 S.Ct. at 635, 46 L.Ed.2d at 688, and *Fed. Election Comm'n v. Beaumont,* 539 U.S. 146, ——, 123 S.Ct. 2200, 2210, 156 L.Ed.2d 179, 193–94 (2003)), because it "applies only to payments for a narrow category of electioneering type activities on a portion of a single campaign day, [§ 13–209] cannot possibly be read to seriously restrict the 'quantity of campaign speech,' ... or to curtail core political expression or activity critical to 'effective speech or political association....'" Rather than strict or exacting scrutiny, "where complex competing constitutionally protected interests such as the right to

vote or the right to spend political money is involved," the State argues for a "more flexible balancing standard" one in which "the level of scrutiny is based on the importance of the 'political activity at issue' to effective speech or political association." *Beaumont*, 539 U.S. at 146, 123 S.Ct. at 2210, 156 L.Ed.2d at 193–94. As demonstrated by the cases cited, *Beaumont, supra; Fed. Election Comm'n v. Colorado Rep. Fed. Campaign Comm., supra; Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000); *Buckley, supra*, the State relies heavily on those cases in which the validity of restrictions of campaign contributions were at issue.

The seminal case regarding the First Amendment and campaign regulation is *Buckley*. In that case, the appellants, various candidates, political contributors, political parties and organizations, brought suit in the United States District Court for the District of Columbia to challenge certain provisions of the Federal Election Campaign Act of 1971 and related provisions of the Internal Revenue Code of 1954, all as amended in 1974, that *inter alia*, limited the allowable amounts of campaign contributions and expenditures. 424 U.S. at 6–8, 96 S.Ct. at 629–30, 46 L.Ed.2d at 680–82. They alleged that such restrictions violated their First Amendment right to free speech.[6] Similar to the case *sub judice*, the appellees argued that the Act only regulated conduct in the form of contributions and expenditures of money and that such conduct only incidentally affected speech. *Id.*, 424 U.S. at 15, 96 S.Ct. at 633, 46 L.Ed.2d at 685.

---

**6.** The provisions restricting campaign contributions limited political contributions to candidates for federal elective office by an individual or group to $1000 and by a political committee to $5,000 per election. The relevant provisions restricting campaign expenditures limited expenditures by a candidate from his personal funds to specific yearly amounts and also restricted overall general and primary campaign expenditures to specific amounts dependent on the office sought. Also challenged, and decided by the Court, were provisions of the act that imposed strict record-keeping requirements for all campaign contributions. We limit our analysis only to those provisions in *Buckley* that concerned campaign contributions and expenditures.

The District Court upheld the constitutionality of the legislation and the Court of Appeals for the D.C. Circuit affirmed, the latter identifying a " 'clear and compelling interest in preserving the integrity of the electoral process.' " *Id.,* 424 U.S. at 10, 96 S.Ct. at 630, 46 L.Ed.2d at 682 (quoting *Buckley v. Valeo,* 519 F.2d 821, 841 (D.C.Cir.1975)). Particularly, the appellate court upheld the constitutional validity of the Act's contribution and expenditure provisions, reasoning that those provisions were aimed at regulating conduct, *id.* at 15–16, 96 S.Ct. at 633, 46 L.Ed.2d at 686, and only incidentally affected or impacted speech. In so holding, it relied on *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), a case in which a defendant challenged his prosecution for burning his draft card, arguing that the act of burning the card was " 'symbolic speech' engaged in as a 'demonstration against the war and against the draft.' " *Buckley,* 424 U.S. at 16, 96 S.Ct. at 633, 46 L.Ed.2d at 686 (quoting *O'Brien,* 391 U.S. at 376, 88 S.Ct. at 1678, 20 L.Ed.2d at 679 (internal quotations omitted)). Assuming that the alleged communicative element of the conduct triggered the protections of the First Amendment, the Court sustained the defendant's conviction, holding that there was " 'a sufficiently important governmental interest in regulating the nonspeech element' that was 'unrelated to the suppression of free expression' and that had an 'incidental restriction on alleged First Amendment freedoms . . . no greater than (was) essential to the furtherance of that interest.' " *Id.,* (quoting *O'Brien,* 391 U.S. at 376–77, 88 S.Ct. at 1678, 20 L.Ed.2d 672 at 680).

Before the Supreme Court, the appellants in *Buckley* argued that the Court of Appeals failed to apply the appropriate critical scrutiny demanded by the First Amendment and equal protection principles. *Id.* 424 U.S. at 11, 96 S.Ct. at 631, 46 L.Ed.2d at 683. Exacting scrutiny was required, they asserted, because contributions and expenditures are "at the very core" of political speech, *id.* at 15, 96 S.Ct. at 633, 46 L.Ed.2d at 685, and "the Act's limitations . . . constitute restraints on First Amendment liberty that are both gross and direct." *Id.*

The Supreme Court agreed with the appellants. Having enunciated the generally accepted principle that the "First Amendment affords the broadest protection to political expression in order to 'assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people,' *id.* at 14, 96 S.Ct. at 633, 46 L.Ed.2d at 685 (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498, 1506 (1957)), and that its purpose 'was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates . . .,' *id.,* (quoting *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484, 488 (1966)), it held that the Act's contribution and expenditure provisions regulated "in an area of the most fundamental First Amendment activities." 424 U.S. at 14, 96 S.Ct. at 632, 46 L.Ed.2d at 685. Furthermore, the Court rejected the argument analogizing those provisions to the limitations on conduct upheld in *O'Brien:*

> "The expenditure of money simply cannot be equated with such conduct as destruction of a draft card. Some forms of communication made possible by the giving and spending of money involve speech alone, some involve conduct primarily, and some involve a combination of the two. Yet this Court has never suggested that the dependence of a communication on the expenditure of money operates itself to introduce a nonspeech element or to reduce the exacting scrutiny required by the First Amendment."

*Id.* at 17, 96 S.Ct. at 633, 46 L.Ed.2d at 686.

Assuming the appropriateness of categorizing "the expenditure of money as conduct," the Court determined nevertheless that the contributions and expenditure limitations at issue in that case would not meet the *O'Brien* test. *Id.* at 17, 96 S.Ct. at 634, 46 L.Ed.2d at 686. While it treated expenditures and contributions the same for purposes of reasonable time, place and manner regulations, noting, in that regard, a critical difference between the limitations imposed in that case and those cases applying reasonable time, place and manner restrictions—"the present Act's contribution and expenditure limitations [also] impose direct quantity restrictions on politi-

cal communication and association by persons, groups, candidates, and political parties," *id.* at 17–18, 96 S.Ct. at 634, 46 L.Ed.2d at 687, the Court acknowledged a distinction between restrictions on contributions and expenditures insofar as they affect political expression.

The Court pointed out that any law limiting the amount of expenditures made by a candidate or a campaign on behalf of a candidate has a direct impact on political expression because the ability to spend money to convey a candidate's political message is inextricably linked to the quantity, and perhaps the quality, of that candidate's political speech. *Id.*, 424 U.S. at 19, 96 S.Ct. at 634–35, 46 L.Ed.2d at 687–88. Thus, the Court stated:

"A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech."

*Id.* (footnotes omitted).

On the other hand, the Court observed:

"By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communi-

cation by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor."

*Id.,* 424 U.S. at 20–21, 96 S.Ct. at 635–36, 46 L.Ed.2d at 689 (footnote omitted). In sum, in contrast to restrictions on expenditures, as to which the Court emphasized, "this Court has never suggested that the dependence of a communication on the expenditure of money operates itself to introduce a nonspeech element or to reduce the exacting scrutiny required by the First Amendment," *id.* at 16, 96 S.Ct. at 633, 46 L.Ed.2d at 687, the Court held that provisions restricting campaign contributions did not unjustifiably burden First Amendment freedoms. *Id.* at 29, 96 S.Ct. at 640, 46 L.Ed.2d at 693–94. In so doing, it paid deference to the congressional judgment as to the governmental interests to be furthered, *id.* at 27–28, 96 S.Ct. at 638–39, 46 L.Ed.2d at 692–93, and concluded that, in the case of contribution restrictions, the test is whether the State "demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment" of that interest, 424 U.S. at 25, 96 S.Ct. at 638, 46 L.Ed.2d at 691, a lesser standard than strict or exacting scrutiny. *See Beaumont,* 539 U.S. at 146, 123 S.Ct. at 2210, 156 L.Ed.2d at 193–94.

This less exacting standard has been applied in the cases on which the State relies, all decided subsequently to *Buckley*

and involving restrictions on campaign contributions. In *Beaumont, supra,* the issue was whether the prohibition against corporations contributing directly to candidates for federal office should be applied to nonprofit advocacy corporations. 539 U.S. at 146, 123 S.Ct. at 2204–05, 156 L.Ed.2d at 186. The Court rejected the argument that the determination as to whether the application of the prohibition was consistent with the First Amendment was subject to strict scrutiny. *Id.* at —— – ——, 123 S.Ct. at 2210–11, 156 L.Ed.2d at 193–94. To be sure, as the State points out, the Court did state that "in setting First Amendment standards for reviewing political financial restrictions: the level of scrutiny is based on the importance of 'the political activity at issue' to effective speech or political association," *id.* at ——, 123 S.Ct. at 2210, 156 L.Ed.2d at 194, (quoting *Federal Election Comm'n v. Massachusetts Citizens for Life,* 479 U.S. 238, 259, 107 S.Ct. 616, 628, 93 L.Ed.2d 539, 557 (1986)), but it is what was at issue and the holding in the case that gives the statement context. Moreover, after making that statement, the Court emphasized its prior treatment of restrictions of political contributions as "merely 'marginal' speech subject to relatively complaisant review under the First Amendment." *Id.* It is significant that the Court then explained why strict scrutiny was not appropriate in the contribution regulation context:

> " 'While contributions may result in political expression if spent by a candidate or an association . . ., the transformation of contributions into political debate involves speech by someone other than the contributor' *Buckley* . . . at 20–21, 96 S.Ct. 612. This is the reason that instead of requiring contribution regulations to be narrowly tailored to serve a compelling government interest, 'a contribution limit involving significant interference with associational rights' passes muster if it satisfies the lesser demand of being 'closely drawn' to match a 'sufficiently important interest.' "

*Id.,* (quoting *Nixon,* 528 U.S. at 387–88, 120 S.Ct. at 904, 145 L.Ed.2d at 898, quoting *Buckley,* 424 U.S. at 25, 96 S.Ct. at 636, 46 L.Ed.2d at 691).

In *Federal Election Comm'n v. Colorado Republican Federal Campaign Comm.*, 533 U.S. at 437, 121 S.Ct. at 2356, 150 L.Ed.2d at 470–71, the Court addressed the issue of whether campaign expenditures by a political party in coordination with that party's candidate should be treated, in the First Amendment context, like campaign contributions or campaign expenditures. Noting that the functional definition of "contribution" includes "expenditures coordinated with a candidate," *id.* at 438, 121 S.Ct. at 2356–57, 150 L.Ed.2d at 471, the Court held that the same scrutiny that applied to the other political actors should be applied to a party's coordinated spending limitation, namely, " 'scrutiny appropriate for a contribution limit, enquiring whether the restriction is 'closely drawn' to match what we have recognized as the 'sufficiently important' government interest in combating political corruption.' " *Id.* at 456, 121 S.Ct. at 2366, 150 L.Ed.2d at 482, (quoting *Nixon*, 528 U.S. at 387–88, 120 S.Ct. at 904, 145 L.Ed.2d at 898, quoting *Buckley*, supra, 424 U.S. at 25, 96 S.Ct. at 638, 46 L.Ed.2d at 691).

The restriction on campaign contributions was also upheld with respect to contributions made by political action committees. *Nixon*, 528 U.S. at 397, 120 S.Ct. at 904–05, 145 L.Ed.2d at 909.[7] *See McConnell v. Federal Election Comm'n,* —— U.S.

---

**7.** Justice Stevens's concurring opinion in *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 398, 120 S.Ct. 897, 910, 145 L.Ed.2d 886, 904–05 (2000) does not support the State's argument that we should apply a lesser standard of scrutiny in this case. Employing a lesser standard of scrutiny than strict or exacting scrutiny, requiring that the provision only be "closely drawn to match a sufficiently important interest," a plurality of the Court held that a Missouri State Statute that imposed limits on campaign contributions did not violate the First Amendment right to speech. To be sure, as the State notes, Justice Stevens concurred, and added:

"Money is property; it is not speech.

"Speech has the power to inspire volunteers to perform a multitude of tasks on a campaign trail, on a battleground, or even on a football field. Money, meanwhile, has the power to pay hired laborers to perform the same tasks. It does not follow, however, that the First Amendment provides the same measure of protection to the use of money to accomplish such goals as it provides to the use of ideas to achieve the same results."

——, —— – ——, 124 S.Ct. 619, 670–73, 157 L.Ed.2d 491, 558–61 (2003), (holding, *inter alia*, that the cost of third-party issue ads coordinated with federal candidates' campaigns could validly be considered as contributions to those campaigns).

In this case, the respondents were hired to further the Ehrlich/ Steele ticket's political message; the campaign expended campaign funds for that purpose. The respondents chose to meet their obligation to the campaign by paying workers to advocate for the ticket by distributing campaign materials, communicating to potential voters a voting preference and electioneering or canvassing the polls, the aim of all of which clearly was to convey a political message. As the Court in *Buckley* pointed out, the spending of money by a political candidate directly affects the ability of that candidate to disseminate his or her political message effectively. It is to prevent that very political speech that § 13–209 specifically was enacted. Indeed, that statute restricts campaign expenditures in the form of payments to individuals to provide "walk around services" on election day. As defined by § 13–209, the

---

*Id.* In a footnote, Justice Stevens clarified his position:
"Unless, of course, the prohibition entirely forecloses a channel of communication, such as the use of paid petition circulators. *Meyer v. Grant*, 486 U.S. 414, 424, 108 S.Ct. 1886, 100 L.Ed.2d 425[, 436–37] (1988) ('Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, one-on-one communication.... The First Amendment protects appellees right not only to advocate their cause but also to select what they believe to be the most effective means for so doing)."
Nor does Justice Breyer's advocation, in his opinion concurring in the judgment in *United States v. American Library Assn., Inc.*, 539 U.S. 194, ——, 123 S.Ct. 2297, 2311, 156 L.Ed.2d 221, 239–40 (2003), of an intermediate level of scrutiny where "complex, competing constitutional interests are potentially at issue or speech-related harm is potentially justified by unusually strong governmental interests." *Id.* The context in that case is quite different from that *sub judice*. As Justice Breyer described it, in *American Library Assn:* "The statutory restriction in question is, in essence, a kind of 'selection' restriction (a kind of editing). It affects the kinds and amount of materials that the library can present to its patrons.... And libraries often properly engage in the selection of materials, either as a matter of necessity (*i.e.*, due to the scarcity of resources) or by design (*i.e.*, in accordance with collection development policies)." *Id.*

relevant statute, these "walk around services" include the distribution of campaign materials, communicating a voting preference, and electioneering or canvassing the polling place, all of which the statute was designed to prevent, or at least has the effect of impacting. All of the activity at which the statute is aimed, in fact, directly impedes the ability of the candidate to convey his political message.

The State urges us to accept that such measures are necessary to prevent the "content-neutral" purpose of avoiding "corruption or the appearance of corruption." We decline to conclude that § 13-209 is content neutral. Whether individuals may exercise their free speech rights by paying another individual to distribute his or her campaign flyers or perform other walk around services "depends entirely on whether their speech is related to a political campaign." *Burson v. Freeman*, 504 U.S. at 197, 112 S.Ct. at 1850, 119 L.Ed.2d at 13 (1992). The Supreme Court "has held that the First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic." *Id.*, (citing *Consolidated Edison Co. of N.Y. v. Public Service Comm'n of N.Y.*, 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319, 328 (1980); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116, 112 S.Ct. 501, 508, 116 L.Ed.2d 476, 487 (1991)). Thus, it is clear that the actual purpose of the legislation "[arises] in some measure because the communication [in the form of paid campaigning] is ... thought to be harmful." *Buckley, supra.* Moreover, the restriction is of a campaign expenditure, which "generally curb[s] more expressive and associational activity than limits on contributions do." *Colorado Rep. Fed'l Campaign Comm.*, 533 U.S. at 440, 121 S.Ct. at 2358, 150 L.Ed.2d at 472. *See Nixon, supra*, 528 U.S. at 386-88, 120 S.Ct. at 904, 145 L.Ed.2d at 897-98; *Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n*, 518 U.S. 604, 615, 116 S.Ct. 2309, 2315, 135 L.Ed.2d 795, 804-05 (1996) (*Colorado I*); *Buckley, supra*, 424 U.S. at 19-23, 96 S.Ct. at 634-37, 46 L.Ed.2d at 687-90. As the Court observed in *Colorado Rep.*

*Fed'l Campaign Comm.,* "limits on contributions are more clearly justified by a link to political corruption than limits on other kinds of unlimited political spending are." 533 U.S. at 440–41, 121 S.Ct. at 2358, 150 L.Ed.2d at 472.

■■■ The State argues that § 13–209 is supported and justified by the compelling governmental interest of ensuring the integrity of, and public confidence in the electoral process. By prohibiting the payment of money for "walk around services", asserts the State, the provision protects the public from "the appearance, if not the reality of vote-buying." [petitioner's brief at 14]. The historical context and background surrounding the enactment of the "walk around services" statute is offered, via newspaper clippings from the 1960s and 1970s, to support the proposition that the statute was enacted to temper the then-rampant corruption and vote-buying in the electoral process. The State also avers that the measure prevents candidates and their supporters from "misleading voters by hiring 'mercenaries' . . . who present the fraudulent appearance of broad public support based on the merits of their candidacies." [petitioner's brief at 16], (quoting *Nixon, supra,* 528 U.S. at 399, 120 S.Ct. at 910, 145 L.Ed.2d at 886 (Justice Stevens, concurring)). The State also relies on *Burson v. Freeman,* 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5.

Additionally, the State argues that § 13–209 is narrowly tailored to accomplish the stated interest for three reasons. First, relying on *Burson v. Freeman, supra,* the State argues that the provision is limited to a single day, the day of the election, when, the State alleges, "the danger of corruption and its appearance are at their height and when payments are most likely to be perceived as a subterfuge for vote-buying." [petitioner's brief at 17]. Second, it asserts that "the prohibition applies only to those whose partisan election day activities are motivated by the potential corrupting influence of money." *Id.* Finally, the State submits that the statute allows candidates to pay for other political campaign activities that are less likely to be corrupt or appear corrupt, including "providing

meals for workers, telephoning voters, transporting them to polls, and media advertising." *Id.*

In *Burson,* the Supreme Court upheld a Tennessee statute that restricted vote solicitation within 100 feet of the polling place. Acknowledging that the statute was a "facially content-based restriction on political speech," 504 U.S. at 198, 112 S.Ct. at 1851, 119 L.Ed.2d at 13,—rather than a restriction on the voicing of a particular viewpoint, it prohibited public discussion of an entire topic—*id.* at 197, 112 S.Ct. at 1850, 119 L.Ed.2d at 13, applying strict scrutiny, the Court held that it was necessary to serve the compelling state interests of protecting the right of the State's citizens to vote freely for the candidates of their choice and ensuring an election conducted with integrity and reliability and that it was narrowly drawn to accomplish those goals. *Id.* at 211, 112 S.Ct. at 1857–58, 119 L.Ed.2d at 21–22. Recognizing that to survive strict scrutiny, it is not enough merely to assert a compelling interest, the State "must demonstrate that its law is necessary to serve the asserted interest," *id.* at 199, 112 S.Ct. at 1852, 119 L.Ed.2d at 15, it examined the evolution of election reform in this country and abroad. *Id.* at 200–06, 112 S.Ct. at 1852–55, 119 L.Ed.2d at 15–19. Following its examination, the Court summarized its findings:

> "In sum, an examination of the history of election regulation in this country reveals a persistent battle against two evils: voter intimidation and election fraud. After an unsuccessful experiment with an unofficial ballot system, all 50 States, together with numerous other Western democracies, settled on the same solution: a secret ballot secured in part by a restricted zone around the voting compartments. We find that this widespread and time-tested consensus demonstrates that some restricted zone is necessary in order to serve the State's compelling interests in preventing voter intimation and election fraud."

*Id.* at 206, 112 S.Ct. at 1855, 119 L.Ed.2d at 19. Thus, critical to the Court's holding was evidence of the history of the election process in the United States during the colonial era, when there were no secret ballots and voters were left open to

flagrant bribery and intimidation, Tennessee's continual historical efforts to reform the election system to ensure the right of voters to vote secretly and without intimidation and the consensus among the states on the need for legislation reducing voter intimidation and bribery to the extent that each of the 50 states had enacted legislation limiting access in or around polling places.

Noting that it is rare that legislation will survive strict scrutiny, the Court pronounced that case to be such a rare instance. 504 U.S. at 210, 112 S.Ct. at 1857, 119 L.Ed.2d at 22. It concluded:

> "Here, the State, as recognized administrator of elections, has asserted that the exercise of free speech rights conflicts with another fundamental right, the right to cast a ballot in an election free from the taint of intimation and fraud. A long history, a substantial consensus, and simple common sense show that some restricted zone around polling places is necessary to protect that fundamental right. Given the conflict between these two rights, we hold that requiring solicitors to stand 100 feet from the entrances to polling places does not constitute an unconstitutional compromise."

*Id.* at 211, 112 S.Ct. at 1857–58, 119 L.Ed.2d at 21–22.

The interest asserted by the State, to prevent real or apparent corruption of the electoral process, is a compelling one. Unlike in *Burson,* however, we are not persuaded that the State has demonstrated that § 13–209 is necessary to serve that interest or that it is narrowly drawn to achieve its asserted goals. To be sure, the State submitted news articles from the 1960's and 70's, concerning the practice of political clubs and/or organizations to pay for walk around services on election day. These articles included *inter alia,* an inside look at the process in one particular club and the views of certain politicians with respect to the corrupting influence and impact of the practice. The petitioner submitted these articles, which also detail the legislative focus on the practice of paying for walk-around services, and how it resulted in the enactment of Acts of 1979, Ch. 217, the direct precursor of § 13–209, as

evidence of the compelling state interest to prevent corruption and it urges this Court to rely on these articles as evidence of the legislative intent behind the enactment of § 13–209's to curb vote-buying, endorsement buying or their appearance. It asserts that the payment for walk around services, given scenarios in which candidates with large campaign budgets paid individuals to provide "campaign services," cast an ominous pall over the then-existing state of the electoral process. One article cited by the State suggested that the payment for these services actually amounted to vote-buying, ensuring that those who were hired to campaign for a given candidate would vote for that candidate on election day. *See* Michael Weisskopf, *Baltimore: Politics as Usual,* Washington Post, September 11, 1978. The State, in addition, offers evidence that there were or are concerns about paying walk around money in other states and that, as a result, bills to prohibit the practice were introduced in several State Legislatures, including Georgia, New Jersey, South Carolina and Louisiana.

This showing does not approach either the clear history of blatant voter intimidation and coercion, offered and relied upon, in *Burson* or the widespread national consensus that Court identified as making the legislative response in that case necessary. Of course, it is not required that the showing in this case be identical to the showing in *Burson* or any other case or that there be some formulaic model for determining whether a compelling state interest has been shown or demonstrated. Nevertheless, it is required that the State "must demonstrate that its law is necessary to serve the asserted interest," *Burson,* 504 U.S. at 199, 112 S.Ct. at 1852, 119 L.Ed.2d at 15. We agree with the Circuit Court, the State simply has not made the requisite showing.

The State has shown neither that the statute is necessary to accomplish the stated goal nor that the statute is narrowly tailored to punish the targeted action without needlessly infringing the First Amendment rights of others. First, the State's purported interest in corruption or apparent corruption of the electoral process by prohibiting vote-buying, endorsement buying or their appearance already is sufficiently

covered by existing statutes. Md.Code (2003) § 16–201 of the Election Law Article (derived without substantive change from Art. 33, § 16–201), imposes penalties of up to $2,500 in fines and up to 5 years imprisonment for anyone who "influence[s] or attempts to influence a voter's voting decision through the use of force, threat, menace, intimidation, bribery, reward, or offer of reward." Md.Code (2003) § 16–203 of the Election Law Article, criminalizes interference with the vote balloting process and prohibits access to campaigners and electioneers within 100 yards of the polling place. Therefore, regarding the State's interest in preventing actual vote-buying, § 13–209 is superfluous and redundant and, thus, is not the least restrictive measure for achieving that goal.

Moreover, we are unconvinced that there exists the appearance, not to mention the actuality, of vote-buying when a candidate pays individuals to campaign on his or her behalf on election day. Logically, in order for the payment in return for campaign services to constitute vote-buying, two things must coalesce: 1) the individual paid to campaign on behalf of the candidate must not have planned to vote for the candidate for which he or she is campaigning; and 2) as a result of payment, the campaigner must have voted for or planned to vote for the candidate. For vote-buying to be "apparent," the voting populace must be aware of these factors. There is no evidence that individuals paid to hand out campaign materials advocating for the Ehrlich/Steele ticket voted for, or would be more likely to vote for, those candidates as a result of being paid to perform walk around services on election day.[8] Neither is there evidence that voters would have had any knowledge that the individuals were paid to hand out leaflets. In fact, the statute does not purport to prohibit payment on the

---

8. In fact, as in the instant case of the homeless individuals hired by the respondent Brookins, it is conceivable that individuals paid to campaign for a given candidate might reside outside of the jurisdiction in which they are campaigning and, thus, would not be eligible to vote in the election for which he or she was hired to campaign. In such situations, there is absolutely no possibility that payment for "walk around services" would result in vote-buying, and, if their nonresidence were known, the appearance of vote-buying.

day of election, when the appearance of vote-buying would be the strongest, but it prohibits payment *at any time* or the incurring of any obligation to pay individuals for campaign services to be performed on the day of the election. Therefore, it is highly unlikely that voters would know that the campaigner was paid at all. There is also no reason to believe that voters would be aware of the paid campaigner's voting preference prior to the day of election. This Court is not willing to uphold a statute that restricts core political speech on the basis of such a speculative and unlikely, in any event, hypothesis.

We also do not believe that paying individuals to hand out leaflets on election day necessarily creates the appearance that a candidate has broader-than-actual constituent support. Inherent in the conclusion that the payment of paid leaflet circulators creates an appearance of false broad-based support is the supposition that those handing out leaflets do not actually support the candidate. That conclusion, however, is not substantiated or even necessarily supported by the weight of probability; it is equally as probable that those hired to hand out leaflets do, indeed, embrace the candidate's political views, as it is that they do not, resulting, therefore, in an accurate reflection of the candidate support. To determine whether or not "broad-based" support for a candidate exists in actuality, in proportion to his or her visible support, would require a court to look into the subjective intent of each campaigner and to attempt to discern the effect of any imbalance between actual support and the perceived support for the candidate on the voters. Even if the payment of paid leaflet circulators created an appearance of greater than actual candidate support, it still does not rival the apparent corruption inherent in the assumption of *quid pro quo* that arises when individuals make large campaign contributions to a candidate. The State's asserted goal of preventing corruption or the appearance of corruption does not rise to the level of a compelling state interest in light of the fact that the measure "restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct

one-on-one communication", *Meyer, supra,* 486 U.S. at 424, 108 S.Ct. at 1893, 100 L.Ed.2d at 434, and thus, it unconstitutionally infringes on freedom of speech protected by the First Amendment.

We are not remotely convinced that the decision of a candidate to spend money conveying his or her message by hiring individuals to hand out literature one-on-one to the voters creates any greater appearance of voter support than any other election-day expenditure. The statute does not penalize a candidate who chooses to spend his money on major network advertising on the day of election, even if he pays the actors to convey their support for his candidacy. Surely, any such expenditure could conceivably lead voters to believe that a given candidate has greater support than he or she actually has, and, in the case of mass media, such a candidate reaches far more voters than volunteers handing out leaflets at the polling place. The statute in this case is not appropriately crafted to justify the restriction of political speech. In *Burson,* the Court recognized that because the Tennessee statute limited the prohibited electioneering zone to the 100 feet surrounding the polling place, the statute was sufficiently narrow to effectuate the goal of ensuring the right to vote free from intimidation and duress while limiting the infringement upon free speech. The statute in this case, (which, we note, purports to alleviate some of the same evils as *Burson:* the election corruption or the appearance of corruption), eliminates all paid political advocacy on the entire day of election, a day, which arguably is the most crucial for conveying a candidate's message. Accepting, as we do and as the Supreme Court does, that a candidate has the right to spend money to best convey his or her political message to the voters, the fact that the statute leaves open other avenues of advocacy does not remedy the fact that a particularly representative form of political speech, one-on-one interaction with the voters, is significantly reduced as a result of § 13–209. *See Meyer v. Grant, supra,* 486 U.S. at 424, 108 S.Ct. at 1893, 100 L.Ed.2d at 436–37.

In effect, considering the fact that Maryland already has statutes that criminalize vote-buying and voter-interference within 100 feet of the polling place, § 13–209 addresses those areas where fraud and corruption may potentially creep into the electoral system. That justification, however, does not give the State the right to abridge speech because it paternalistically seeks to establish a completely fraud-free atmosphere within which the electorate is exposed only to the absolute untainted truth about political candidates or their platforms. We embrace the reasoning conveyed by the Colorado Court of Appeals and the Supreme Court in *Meyer*, *supra*, that "[t]he First Amendment is a value-free provision, whose protection is not dependent on 'the truth, popularity, or social utility of the ideas and beliefs which are offered.'" *Meyer*, 486 U.S. 414, 419, 108 S.Ct. 1886, 1891, 100 L.Ed.2d 425, 433 (1988) (quoting *Grant v. Meyer*, 828 F.2d 1446, 1455 (10th Cir.1987) quoting *NAACP v. Button*, 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405, 425 (1963)). "'The very purpose of the First Amendment is to foreclose public authority assuming a guardianship of the public mind . . . in this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us.'" *Meyer v. Grant*, 486 U.S. at 419–20, 108 S.Ct. at 1891, 100 L.Ed.2d at 433–34, (quoting *Grant v. Meyer*, 828 F.2d at 1455, quoting *Thomas v. Collins*, 323 U.S. 516, 545, 65 S.Ct. 315, 329, 89 L.Ed. 430, 448 (1945) (Jackson, J. Concurring)).