**Melanie Senter LUBIN, Securities Commissioner
for the State of Maryland**

v.

**AGORA, INC.**

**No. 128, Sept. Term, 2003.**

Court of Appeals of Maryland.

Sept. 12, 2005.

4

Julie L. Tewey, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

Lee T. Ellis, Jr. (Bruce W. Sanford, Baker & Hostetler, LLP, Washington, DC, Matthew J. Turner, General Counsel, Agora, Inc., Baltimore, on brief), for appellee.

Peter E. Keith, Gallagher, Evelius & Jones, LLP, Baltimore, Mark J. Davis, Stephen W. Hall, Asst. General Counsels, Northern American Securities Administrators Assn., Inc., Washington, DC, Amicus Curiae.

Mary R. Craig, Towson, Amici Curiae.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, ELDRIDGE, JOHN C. (Retired, specially assigned) JJ.

RAKER, J.

Pursuant to an investigation into potential violations of Maryland securities laws, appellant, the Maryland Securities Commissioner, served two subpoenas *duces tecum* on appellee, Agora, Inc., a company whose business includes publishing investment newsletters. Following Agora's refusal to produce its subscriber lists, marketing lists, and other documents containing information identifying any of its subscribers, the Commissioner filed a motion to compel enforcement. The trial court denied the motion, concluding that the Commissioner had failed to demonstrate a compelling need for the subscriber lists as required by the First Amendment and that the demand for subscriber lists was overbroad. We must decide whether the First Amendment to the United States Constitution prevents the Commissioner from compelling discovery of the identities of Agora's subscribers. We shall hold that it does.

### I.

Agora is a Maryland corporation that publishes books and newsletters on topics such as investment, travel, leisure, and health. In the investment newsletter market, it fields more than a dozen offerings, with such colorful titles as "Pirate Investor," "Contrarian Speculator," and "The Flying V Lock-up Trader." It also operates an investors' group known as "The Oxford Club," which offers its members a variety of benefits, including a twice-monthly newsletter, internet advisories, meetings and seminars, a telephone hotline, and use of a club room at Agora's headquarters in Baltimore.

The Commissioner heads the Maryland Division of Securities (the "Division"), an administrative agency charged with enforcement of the Maryland Securities Act, Maryland Code (1975, 1999 Repl.Vol., 2004 Cum.Supp.) § 11–101 *et seq.* of the

Corporations and Associations Article,[1] including the regulation of investment advisers and broker-dealers and the offer and sale of securities.

The Division commenced an investigation of Agora based on two activities undertaken by Agora. First, Agora sent a May, 2002 mass email ("the Email") to an indeterminate number of its own subscribers, and to other individuals drawn from commercially-available marketing lists.[2] The Email offered a four-page report ("the Report") on an unnamed company, in which investors were promised they would "make a fortune." According to the Email, one of Agora's newsletter columnists had received "insider information" that a nuclear arms reduction treaty between the United States and Russia would be signed on a specific date and would create enormous profits for the unnamed company. The Email advised that investors could "double or even triple" their money by purchasing stock in the unnamed company on May 21, 2002, and selling two days later, after the public announcement of the international agreement. The name of this company would be revealed only to those who purchased the report, which was priced at $1,000.

How many copies of the report were transacted is unclear, but at least one person filed a complaint with the Division after he purchased the report, followed its advice to invest in United States Enrichment Corporation, Inc. ("USEC"), and lost money when the stock's price declined.

---

1. Unless otherwise indicated, all future statutory references shall be to the Corporations and Associations Article of Maryland Code (1975, 1999 Repl.Vol., 2004 Cum.Supp.).

2. The number and identities of the persons to whom Agora sent the Email are unknown to this Court, because this information is among that sought by the Commissioner and withheld by Agora. In its brief before this Court, however, Agora notes that the Email "was distributed to readers of well over a dozen Agora financial newsletters," and that a demand for a list of recipients equated to "a demand for a list of virtually all of Agora's investment newsletter subscribers." For purposes of this opinion, we will assume that at least some of the recipients of the Email were subscribers to Agora publications, and that at least some of the recipients were not subscribers to Agora publications.

The second activity that interests the Division is Agora's operation of the Oxford Club. In particular, the Division was concerned about a venture known as the "Oxford Club—Chairman's Circle," which, according to a direct-mail advertisement, featured "[l]ifetime access" to annual "private teleconference[s] covering the issues most critical to our small group ... the world's most knowledgeable experts to walk us through important strategies ... a Chairman's Circle private researcher ... to help you find specific information concerning a certain stock, offshore investments, global banking, real estate or any other issue concerning investing and wealth protection," as well as the "private numbers" of the Oxford Club's Executive Director, Research Director, and members of its Investment Advisory Panel. The price to join the Chairman's Circle was $5,000, and additional sums were due annually.

The Commissioner is investigating whether these activities violate Maryland securities law. First, she alleges that the Email or Report could violate the antifraud provisions codified at §§ 11–301 and 11–302 of the Securities Act.[3] Second, the Commissioner alleges that the activities of the Oxford Club

---

3.  Section 11–301 of the Securities Act makes it unlawful for:
    "any person, in connection with the offer, sale or purchase of any security, directly or indirectly to: (1) Employ any device, scheme, or artifice to defraud; (2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person."
    Section 11–302 of the Securities Act makes it unlawful for:
    "any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, or for acting as an investment adviser or representative under § 11–101(h) and (i) of this title, whether through the issuance of analyses, reports, or otherwise, to: (1) Employ any device, scheme, or artifice to defraud the other person; (2) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on the other person; (3) Engage in dishonest or unethical practices as the Commissioner may define by rule."

(and possibly the Email and Report) could constitute individualized investment advice and thus subject Agora to the registration requirements of § 11–401.[4]  (Agora is not registered in Maryland as an investment advisor.)   The Commissioner's concerns in this regard are not limited strictly to the Oxford Club; she suspects that Agora may be offering individualized investment advice in other contexts.   Third, the Commissioner alleges that Agora may have referred customers to specific brokerages for specific trades, possibly including the USEC matter, thus acting as an "introducing broker" and subjecting it to the broker-dealer registration requirements of § 11–401.[5]  (Agora is not registered in Maryland as a broker-dealer.)

In furtherance of her investigation, the Commissioner issued two subpoenas *duces tecum* pursuant to her power under

---

**4.**   Section 11–101(h) of the Securities Act defines an investment adviser as:

"[A]   person who, for compensation ... [e]ngages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities ... or [p]rovides or offers to provide, directly or indirectly, financial and investment counseling or advice, on a group or individual basis."

Section 11–101(h)(2)(v) excludes from the definition of an investment adviser:

"[a]   publisher of any bona fide newspaper, news column, newsletter, news magazine, or business or financial publication or service, whether communicated in hard copy form, or by electronic means, or otherwise, that does not consist of the rendering of advice on the basis of the specific investment situation of each client."

Section 11–401(b) provides, in relevant part:

"[a]   person may not transact business in this State as an investment adviser or as an investment adviser representative unless:

(1) The person is registered as an investment adviser or an investment adviser representative under this subtitle"

(The statute provides certain exemptions not applicable here.)

**5.**   Section 11–101(c) defines a broker-dealer as "a person engaged in the business of effecting transactions in securities for the account of others or for his own account."   Certain exemptions from this definition are provided, but are not applicable here.   Section 11–401(a) states that "[a] person may not transact business in this State as a broker-dealer or agent unless the person is registered under this subtitle."

§ 11–701(b). In the June 26 subpoena, she demanded, *inter alia,*

"4. Information regarding the circulation of The Oxford Club newsletter.

5. Information regarding the circulation of each of the following newsletters: [seventeen newsletters named.]

\*　　\*　　\*

10. Identifying information as to all persons and newsletter subscribers to whom the Tip [*i.e.* the Email] was electronically mailed or otherwise sent, including name, address, email address and telephone number, or all documents containing that information. For newsletter subscribers, please show which newsletters are subscribed to.

11. Identifying information for all persons and newsletter subscribers who purchased the Tip [*i.e.* the Report], including name, address, email address and telephone number, or all documents containing that information. For newsletter subscribers, please show which newsletters are subscribed to.

\*　　\*　　\*

14. All complaints or inquiries (including written, electronic and summaries of verbal complaints or inquiries) regarding the Tip or USEC Inc.

15. All correspondence regarding the Tip or USEC Inc."

In the March 31, 2003 subpoena, the Commissioner demanded, *inter alia,*

"28. Client files relating to the 'Members Liaison' and 'Telephone Hotline' referred to at p. 7 of Exhibit E, including notes, memoranda and correspondence generated in connection with Oxford Club members' inquiries, including that with respect to member representatives and clients.

\*　　\*　　\*

30. All complaints, including written complaints or synopses of verbal complaints, generated in connection with Exhibits A through E [Agora advertisements]."

Although Agora complied with the remainder of the subpoenas, it did not comply, or at least did not comply fully, with the items listed *supra*.

In March 2003, the Commissioner informally narrowed her request for subscriber identifying information with respect to Items 10 and 11 of the June 2002 subpoena, demanding that Agora produce identifying information for Maryland subscribers only. Agora refused consistently to produce any information identifying any of its subscribers.

The Commissioner filed a complaint against Agora, amended in May 2003, in the Circuit Court for Baltimore City, for refusing to comply with the Division's June 2002 and March 2003 subpoenas, and moved for enforcement of the subpoenas. Agora admitted that it had not produced all the information demanded, but raised as an affirmative defense the protections of the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights. The Circuit Court held a hearing as to whether the subpoena should be enforced. Before that court, the Securities Commissioner made clear to the court, and Agora agreed,[6] that the only issue before the court was the Commissioner's request to the court to enforce the subpoena for the subscriber list.

The Circuit Court for Baltimore County denied enforcement of the subpoenas. The court reasoned as follows:

"I do not believe that in our Bill of Rights that there is any provision that has higher priority than the First Amendment, and I think courts must be very zealous in guarding that most fundamental of all rights and not allow any erosion thereof.

And I do believe that what the Commissioner is attempting to do here is, in its own relatively small way, an attempt to erode the fundamental principle. I do not believe that

---

**6.** Agora advised the court at the hearing to enforce the subpoena, and before this Court at oral argument, that everything had been supplied to the State, with the exception of the subscriber lists. The State did not controvert this representation.

the Commissioner has made out any compelling showing why Agora, Inc., must release its subscriber list.

In counsel's opening argument, she said it would be very helpful, and perhaps it would be. And even assuming it would be, that doesn't win the ball game. That's not what the Commissioner has to show. Counsel has argued it would be very useful to us. More than once, she said it would be very useful to us to show what the actions of Agora may have been.

Counsel has argued that by seeing these subscriber lists it may implicate Agora by talking to the subscribers, a fishing expedition is what this is called. You know, we'd like to talk to subscribers and maybe we'll find something to implicate Agora. Maybe so. Maybe you would, but that is no basis for this.

There is no attempt to zero in on certain subscribers or a certain class of subscribers, but all subscribers. Not that a narrowing of the list would be permissible either, but at least we're not at that point. It's a shotgun approach.

Counsel has argued, well it's relevant to the inquiry. Well, a million things can be relevant to an inquiry. And particularly when you are beginning an inquiry, one never knows what might be relevant. And to simply say to the Court well, this is relevant to an inquiry, which means a very broad-based pursuit, looking for whatever you might be able to find, that's not enough.

I think there are other avenues that might well be available to the Commissioner to obtain the identity of certain subscribers, be able to talk to certain subscribers. There is no showing there at all that that would not be possible. There is no showing here at all that the Commissioner has made any concentrated effort to speak to subscribers, locate them, get the information which the Commissioner is seeking.

And the fact that counsel has stated, well, it's been narrowed down to Maryland subscribers is of no moment. I think it is definitely over broad.

As I've indicated, if it were particularized to a certain group of subscribers only, I'm not sure whether that would remedy it either. But we don't have that situation. We have the situation here of all the subscribers in the State of Maryland. It is for these reasons that the Commissioner's motion is denied."

The Commissioner noted a timely appeal to the Court of Special Appeals. Before consideration by that court, we issued a writ of certiorari on our own initiative. *Securities Commissioner v. Agora,* 380 Md. 230, 844 A.2d 427 (2004).

## II.

The Commissioner argues that the Circuit Court erred in its determination that First Amendment interests are implicated by the subpoenas and, therefore, failed to apply the proper test for enforcement of administrative subpoenas. The Commissioner argues that the subpoenas satisfy the three-part test articulated by the Supreme Court in *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 208–09, 66 S.Ct. 494, 505–06, 90 L.Ed. 614 (1946), and recognized by this Court in *Banach v. State Commission on Human Relations,* 277 Md. 502, 506, 356 A.2d 242, 245–46 (1976), for enforcement of an administrative agency subpoena: (1) "the inquiry is authorized by statute;" (2) "the information sought is relevant to the inquiry;" and (3) "the demand is not too indefinite or overbroad." *See also State Commission v. Freedom Express,* 375 Md. 2, 12, 825 A.2d 354, 360 (2003).

The Commissioner asserts that the information sought is relevant to the investigation, which is authorized by statute, because having access to such information would allow the Division to investigate thoroughly whether Agora has violated provisions of the Securities Act, including §§ 11–301 and 11–302 (antifraud provisions), and § 11–401 (broker-dealer and investment adviser registration requirements). Speaking with subscribers and potential customers would allow the Commissioner to ascertain whether Agora transacted business as an investment adviser without registering as such in violation of

§ 11–401 by, for example, providing personalized investment advice at Agora-hosted conference calls and symposia. Having access to contact information for those persons who received the Email or purchased the Report also would enable the Commissioner to question those individuals about their dealings with Agora to determine whether Agora violated the Securities Act's antifraud provisions by, for example, communicating false or misleading information to investors in a nonpublished format. The Commissioner maintains that the subpoenas satisfy the third prong of the *Banach* test because the demands are sufficiently definite and reasonable in scope considering the purpose of the investigation, and compliance with the subpoenas would not be burdensome.

The Commissioner further contends that no legitimate First Amendment interest would be implicated by enforcement of the subpoenas because the subpoenas do not restrict Agora's publishing activities in any way. The Commissioner claims that the subpoenas are enforceable because they were issued in connection with the Email, which she maintains is unprotected commercial speech because it is misleading and serves Agora's economic interests. Further, the Commissioner argues that the subpoenas do not implicate associational rights of Agora's subscribers because the Commissioner seeks subscriber identities only as a means of fulfilling her statutory duty to protect investors and not in an effort to learn more about their associational ties or political persuasions.

Agora argues that the First Amendment to the United States Constitution, Article 40 of the Maryland Declaration of Rights, and Maryland public policy promoting the free flow of information require a heightened level of review when an administrative subpoena seeks the disclosure of a publisher's subscriber lists. Instead of merely satisfying the *Banach* test, Agora argues, the Commissioner must show the relevancy of the information sought, a compelling need for the information, and proof that the State has no other available means of obtaining it. Claiming that it has standing to assert the constitutional rights of its subscribers, Agora also argues that

the First Amendment associational rights of its readers trigger "exacting" scrutiny, as "probing questioning from regulators about their reading habits ... will undoubtedly discourage these readers from maintaining their relationship with the publisher" and exercising their First Amendment freedoms. *See Buckley v. Valeo*, 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976) ("We long have recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. Since *NAACP v. Alabama* [357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) ] we have required that the subordinating interests of the State must survive exacting scrutiny.")

Agora maintains that the Commissioner has failed to show a compelling need for subscriber lists and has not exhausted other avenues for investigating Agora's compliance with the Maryland Securities Act. First, Agora argues that the Division has no compelling need for subscriber lists in investigating whether Agora acted as an unregistered investment adviser in violation of § 11–401. Noting that the Commissioner has offered no evidence that Agora has provided personalized investment advice to its readers, Agora asserts that the subpoenas' "dragnet" for the identities of all subscribers cannot meet the heightened requirement of a compelling or overriding governmental need. Agora maintains that, in the context of the Division's inquiry into possible noncompliance with investment advisor provisions, there are alternatives to demanding subscriber lists. Such alternatives might include gathering information from a narrower group of individuals who participated in Agora seminars, conference calls, and telephone hotline services, or seeking information from Agora employees themselves regarding communications to subscribers.

Second, Agora maintains that there is no compelling or even relevant need for subscriber lists to investigate whether Agora violated antifraud provisions of Maryland securities laws. Even assuming that § 11–301 could provide a cause of action

against Agora, which Agora maintains it could not,[7] Agora asserts that the text of its publications, along with its trading records, which it has produced, would suffice in determining whether it made any false or misleading statements "in connection with" the offer, sale, or purchase of securities. Further, Agora maintains that the Commissioner's desire to know the extent to which readers may have relied upon Agora's statements and suffered harm as a result cannot justify the demand for subscriber lists because reliance and damages are irrelevant to any action the Commissioner might bring against Agora under § 11–301. In sum, Agora argues that the Commissioner has made no compelling connection between the subjects of the inquiry and the request for identifying information of Agora subscribers.

## III.

We must determine whether the Commissioner legally may compel Agora to produce the subscriber lists. Ordinarily, administrative agency subpoenas will be enforced if the agency's investigation is statutorily authorized, the information sought by the subpoena is relevant to the investigation, and the demand is not indefinite or overbroad. *Banach v. St. Comm'n on Human Rel.*, 277 Md. 502, 506, 356 A.2d 242, 245–46 (1976). The First Amendment, however, creates "an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the

---

7. Section 11–301 of the Maryland Securities Act makes it unlawful to make false or misleading statements "in connection with the offer, sale, or purchase of any security." Agora asserts that, as a matter of law, it cannot make a materially false statement "in connection with" the offer, sale, or purchase of any security because Agora merely publishes information about, and does not trade in, the stocks it recommends. *See SEC v. Wall Street Publ'g Inst.*, 664 F.Supp. 554, 556 (D.D.C.1986), *rev'd on other grounds*, 851 F.2d 365 (D.C.Cir.1988) (holding that statements in investment newsletters were not "in connection with" securities transactions merely because readers might rely on them in deciding whether to invest, and therefore § 10(b) of the Securities Exchange Act of 1934, the federal counterpart to § 11–301, is not applicable to the publisher of an investment newsletter).

State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest." *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 546, 83 S.Ct. 889, 893–94, 9 L.Ed.2d 929 (1963). We must examine the information sought by the Commissioner to determine whether to apply the ordinary *Banach* inquiry, or the much more exacting scrutiny required by the First Amendment. Having made that determination, we must then determine whether the applicable standard has been met.

The First Amendment to the United States Constitution provides in part that "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." [8] The Supreme Court long has recognized that the freedoms of speech and the press protected by the First Amendment encompass much more than the right to speak, write, and publish. *See Griswold v. Connecticut*, 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965) ("The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read.") Recognizing the interdependence between receipt of information, on the one hand, and expression of information on the other, the Court has stated:

> "This right [to receive information and ideas] is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution, in two senses. First, the right to receive ideas follows ineluctably from the sender's First Amendment right to send them. . . . More

---

8. Agora argues that the rights it asserts under the First Amendment are the same as the rights guaranteed by Article 40 of the Maryland Declaration of Rights. This Court often has interpreted Article 40 *in pari materia* with the First Amendment. *See State v. Brookins*, 380 Md. 345, 350 n. 2, 844 A.2d 1162, 1165 n. 2 (2004); *The Pack Shack, Inc., v. Howard County*, 377 Md. 55, 64 n. 3, 832 A.2d 170, 176 n. 3 (2003). As we stated in *The Pack Shack*, "[i]n light of the facts and arguments in the case at bar, ... we shall regard the claimed violation of Article 40 and the claimed violation of the First Amendment as a single issue." *Id.* at 65 n. 3, 832 A.2d at 176 n. 3.

importantly, the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom."

*Bd. of Educ., Island Trees Union Free School Dist. No. 26 v. Pico,* 457 U.S. 853, 867, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1982) (emphasis in original).

██ The First Amendment protects broadly the rights of individuals to read and to receive ideas. First Amendment freedoms are implicated and infringed directly when the government denies access to or proscribes reading materials on the basis of the contents of those materials. *See, e.g., id.* (holding that the First Amendment prohibits the government from removing books from the shelves of a school library based on the ideas contained in those books); *Stanley v. Georgia,* 394 U.S. 557, 559 89 S.Ct. 1243, 1245, 22 L.Ed.2d 542 (1969) (holding that a state statute criminalizing the mere possession of obscene materials in a person's home violates the First Amendment). The First Amendment is implicated also when regulations deter or interfere with the receipt of information and free flow of ideas.

In *United States v. Rumely,* 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953), the Supreme Court said of government inquiry into the identities of those who purchase or read certain materials:

"Surely it cannot be denied that giving the scope to the resolution for which the Government contends, that is, deriving from it the power to inquire into all efforts of private individuals to influence public opinion through books and periodicals, however remote the radiations of influence which they may exert upon the ultimate legislative process, raises doubts of constitutionality in view of the prohibition of the First Amendment."

*Id.* at 46, 73 S.Ct. at 546.[9] Unlike the majority in that case, Justice Douglas would have reached the constitutional issue.

---

9. The majority in *Rumely* did not reach this constitutional issue because it concluded that the House of Representatives, in authorizing the

His concurrence explains persuasively how freedom of expression is threatened by government inquiry into the identities of those who purchase or read certain materials:

"A requirement that a publisher disclose the identity of those who buy his books, pamphlets, or papers is indeed the beginning of surveillance of the press.... Once the government can demand of a publisher the names of the purchasers of his publications, the free press as we know it disappears. Then the spectre of a government agent will look over the shoulder of everyone who reads. The purchase of a book or pamphlet today may result in a subpoena tomorrow. Fear of criticism goes with every person into the bookstall. The subtle, imponderable pressures of the orthodox lay hold. Some will fear to read what is unpopular.... The press and its readers will pay a heavy price in harassment.... If [a book-buyer] can be required to disclose what she read yesterday and what she will read tomorrow, fear will take the place of freedom in the libraries, bookstores, and homes of the land.... Congress could not do this by law. The power of investigation is also limited."

*Id.* at 57–58, 73 S.Ct. 543, 551–52 (Douglas, J., concurring).

The Supreme Court has condemned as unconstitutional the deterrent effect on speech that could arise if the government required readers to identify themselves before receiving through the mail certain reading material. *See Lamont v. Postmaster Gen.,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). In *Lamont,* the Court struck down a postal regulation that required an addressee to file a written request with the post office before receiving "communist political propaganda." *Id.* at 307, 85 S.Ct. at 1496. The Court held that the requirement that readers of such material identify themselves before getting access to the material was "almost certain to have a deterrent effect." *Id.* The Court stated that the postal regula-

---

Select Committee on Lobbying Activities to investigate "lobbying activities," had not conferred upon the committee the authority to inquire into matters such as the distribution of books and pamphlets to influence legislation indirectly. *Id.* at 47, 73 S.Ct. at 546.

tion at issue was "at war with the 'uninhibited, robust, and wide-open' debate and discussion that are contemplated by the First Amendment." *Id.* at 307, 85 S.Ct. at 1496–97 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)). Although the Court did not hold explicitly that readers have a right to keep either their identities or the contents of what they read secret, *Lamont* at least suggests that the First Amendment protects a right to read anonymously, free from government monitoring or surveillance.

■ The Supreme Court has recognized that government inquiry into an individual's choice of associates may produce a chilling effect on exercise of the freedom of association protected by the First Amendment. Thus, an essential component of that freedom is a right of associational anonymity. *See generally NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). In *NAACP*, the Attorney General of Alabama filed suit in equity to enjoin the NAACP from conducting any activities in the state, alleging that the NAACP was a foreign corporation that had failed to qualify before doing business in the state. The State moved for the production of a large number of the NAACP's records and documents, including a list of the names and addresses of all Alabama members of the NAACP. The NAACP refused to produce its membership lists, contending that compelled disclosure abridged the constitutional rights of its members to engage in lawful association.

The Supreme Court held, as a threshold matter, that the NAACP had standing to assert the constitutional rights of its members because, if the members did possess the right to prevent release of their identities to the government, requiring the members to be parties to the litigation would nullify that right. *Id.* at 459, 78 S.Ct. at 1170. Underscoring the "vital relationship between freedom to associate and privacy in one's associations," *id.* at 462, 78 S.Ct. at 1172, the Court held that "immunity from state scrutiny of membership lists ... is here so related to the right of the members to pursue their

lawful private interests privately and to associate freely with others in so doing as to come within the protection of the Fourteenth Amendment." *Id.* at 466, 78 S.Ct. at 1174. Considering the physical threats, economic reprisals, and other displays of hostility faced by members whose identities had been revealed in the past, the Court stated that compelled disclosure of the NAACP's membership list entailed the likelihood of a "substantial restraint" upon the members' rights to associate freely. *Id.* at 462, 78 S.Ct. at 1172. Finally, concluding that disclosure of the names and addresses of the NAACP's members had no perceptible, substantial bearing on an inquiry into whether the organization had conducted business in the State or was required to comply with the registration statute, the Court held that the State of Alabama lacked an interest substantial enough to justify the likely deterrent effect of disclosure. *Id.* at 465–66, 78 S.Ct. at 1173–74.

Although the Supreme Court has not addressed squarely the issue of whether individuals have a constitutionally protected right to read anonymously, the Court's First Amendment jurisprudence suggests that the government has no greater right to inquire into an individual's choice of reading materials than it does to inquire into an individual's choice of associates. Connecting the importance of privacy to the preservation of free speech, Justice Douglas opined that the First Amendment forbids the government from inquiring into the identities of persons who buy particular books or other printed materials. *Rumely,* 345 U.S. at 57–58, 73 S.Ct. at 551–52 (Douglas, J., concurring). "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP,* 357 U.S. at 462, 78 S.Ct. at 1172 (citing *Rumely,* 345 U.S. at 57–58, 73 S.Ct. at 551–52 (Douglas, J., concurring)). In holding that the government may not criminalize the private possession of obscene materials, the Court in *Stanley* considered in tandem the "right to receive information and ideas, regardless of their social worth" and the "right to be free, except in very limited circumstances, from unwarranted governmental intrusions into

one's privacy." *Stanley,* 394 U.S. at 564, 89 S.Ct. at 1247–48. The Court recognized that the appellant in that case was asserting broadly "the right to be free from state inquiry into the contents of his library." *Id.* at 565, 89 S.Ct. at 1248.

More recently, the Court struck down a provision of a federal statute that required cable system operators to segregate and block "patently offensive" sex-related material appearing on leased channels and to unblock and reblock the channel only upon a subscriber's written request. *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC,* 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996). Disapproving of the written notice requirement, the Court stated that the requirement "will further restrict viewing by subscribers who fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish to watch the 'patently offensive' channel." *Id.* at 754, 116 S.Ct. at 2391.

The Supreme Court has recognized that the right to privacy of association and belief guaranteed by the First Amendment encompasses more than the right to be free from government inquiry into one's membership in organizations and the names of one's co-members. Addressing the First Amendment implications of disclosure requirements [10] in the Federal Election Campaign Act of 1971, the Court stated that "invasion of privacy and belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations, for 'financial transactions can reveal much about a person's activities, associations, and beliefs.'" *Buckley v. Valeo,* 424 U.S. 1, 66, 96 S.Ct. 612, 657, 46 L.Ed.2d 659 (1976) (quoting *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 78–79, 94 S.Ct. 1494, 1526, 39 L.Ed.2d 812 (1974) (Powell, J., concurring)). Compelled disclosure of an individual's decision to read, purchase, or subscribe to

---

**10.** The provisions at issue required, *inter alia,* that political committees and candidates file with the government reports containing the name, address, occupation, and principal place of business of any individual who contributed over $100.00 to the committee or candidate in a calendar year. *See* 2 U.S.C. § 431 *et seq.* (1970).

certain publications may invade that individual's privacy of belief and association to just as great an extent.

■ To the extent that the Commissioner's subpoenas require Agora, a publisher, to disclose the identities of those who subscribe to or purchase its materials, the subpoenas seek information within the protective umbrella of the First Amendment. Enforcement of the subpoenas would intrude upon the First Amendment rights of Agora's subscribers and customers [11] because disclosure of their subscriber status and purchase of the Report would destroy the anonymity that the Supreme Court has recognized as important to the unfettered exercise of First Amendment freedoms. If the names of Agora's readers were disclosed to the government, they might be subjected to questioning from investigators about their reading habits. Agora's subscribers may be discouraged from reading its materials if they are interviewed by government personnel investigating potential securities violations, even if the readers are told that, individually, they are not under investigation.

■ We do not accept the Commissioner's contention that Agora's subscribers enjoy a lower level of First Amendment protection because the Email or Report may have been "commercial speech," possibly even false commercial speech. Commercial speech enjoys a lower level of protection when it is true, and no protection at all when it is false or misleading. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). But revealing the subscriber information would not only disclose that the subscribers had received the Email or Report; it would necessarily reveal that the subscribers had received *other* Agora publications. Even assuming *arguendo* that the Email and Report were commercial speech,

---

11. The Commissioner has not argued that Agora does not have standing to assert the constitutional rights of its subscribers and customers. *Cf. Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383, 392–93, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988) (holding that booksellers had standing to allege an infringement of the First Amendment rights of bookbuyers).

there is no credible allegation that Agora's newsletters in general fit the Supreme Court's limited definition of that category, announced in *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986)—"speech that does no more than propose a commercial transaction."

In order to compel production of the subscriber information, the Commissioner must therefore establish a substantial relation between the information sought and an overriding and compelling State interest. The Commissioner seeks the subscriber information in order to question subscribers whether Agora transmitted false and misleading information in the Email, whether the subscribers had been witnesses or victims of other, unspecified acts of securities fraud by Agora, and whether they had ever been provided with brokerage services or individualized investment advice by Agora. Referring to Agora's subscribers, counsel for the Division stated at the hearing in the Circuit Court that "it would be very useful to us to be able to talk to those people." Although having access to lists of Agora's subscribers and customers might be helpful to the Commissioner in the context of the investigation, the Commissioner has not shown a compelling need for the subscriber information.

The Commissioner has failed to show a sufficient nexus between the investigation into whether Agora acted as an unregistered investment adviser, on the one hand, and the demand for a list of those subscribers who received the Email, on the other. The Commissioner has not alleged that the Email was individually tailored to the portfolios of individual recipients. The advertisements for the Oxford Club and other non-newsletter activities may suggest that, in the context of those activities, Agora engaged in conduct that constituted individual investment advice. But the Commissioner has not alleged that Agora provided individualized advice to newsletter subscribers. Likewise, no substantial nexus exists between the Commissioner's investigation into Agora's alleged unregistered brokerage activities and the indiscriminate de-

mand for the identities of countless newsletter subscribers who *possibly* might have been offered such services.

The Commissioner also has failed to establish a nexus between the request for subscriber information and the investigation into whether Agora has engaged in fraud in connection with securities transactions. The question of whether the Email or other Agora advertisements and publications contain false or misleading statements may be resolved by examining the text of these communications; resolution of this question does not require a list of every person who received them.

The fact that the Commissioner might possibly ferret out additional instances of securities fraud by contacting essentially every subscriber to every Agora investment newsletter does not establish a sufficient nexus between that government interest and the wholesale disclosure of those subscribers' identities. Persons who believe that they have received false or misleading communications from Agora are entitled to contact the Division if they wish to; likewise they are entitled, under the First Amendment, to maintain their anonymity.

The Circuit Court characterized correctly the Division's desire for subscriber information as a "fishing expedition." Although access to this information might be useful to the Division's investigation, the State has not shown that it has any compelling need for its disclosure. Enforcement of this demand would "sacrifice First Amendment protections" for too "speculative a gain." *CBS v. Democratic Nat'l Comm.,* 412 U.S. 94, 127, 93 S.Ct. 2080, 2099, 36 L.Ed.2d 772 (1973). Agora cannot be compelled to produce the subscriber information.

■ The purchaser information gives rise to a slightly thornier First Amendment question, because individuals who purchased the Report were not necessarily subscribers to Agora's regular publications, and thus may not share the freedom of association concerns attributable to subscribers. Nonetheless, we believe that the speech-specific principles articulated in *Griswold, Pico, Rumely, Stanley,* and *Lamont* give rise to a protection that shields the identities of those who

purchase individual publications. The United States District Court for the District of Columbia addressed this issue when the Office of Independent Counsel issued subpoenas *duces tecum* to two bookstores in the Washington D.C. area, demanding specific titles of books purchased by White House intern Monica Lewinsky. *See In re Grand Jury Subpoena to Kramerbooks & Afterwords Inc.*, 26 Media L. Rptr. 1599 (D.D.C.1998). Ms. Lewinsky alleged that her right to buy books had been chilled "for fear of intrusion and embarrassment." *Id.* at 1600. The bookstores claimed that enforcement of the subpoenas would burden not only their First Amendment rights to distribute reading materials, but also their customers' First Amendment rights to have access to such material. *Id.* The court concluded that the First Amendment was implicated by the subpoenas and that "the bookstores and Ms. Lewinsky have persuasively alleged a chilling effect on their First Amendment rights." *Id.*

The commercial speech doctrine does not diminish the protection that the First Amendment affords to the purchaser information. The "insider information" contained within the Report may have been genuine; it may also have been fabricated. But so long as the Report did more than propose a commercial transaction between Agora and the purchasers, it was not solely "commercial speech," and its falsity would not diminish the purchasers' interests in anonymity.[12] *See Posadas de Puerto Rico*, 478 U.S. at 340, 106 S.Ct. at 2968. While the Report did urge its purchasers to engage in a commercial transaction, *viz.*, investment in USEC stock, it did not propose that its readers should buy their shares from Agora.

We therefore consider the request for purchaser information under the standard for First Amendment-implicated

---

12. We also question the Commissioner's underlying premise, *i.e.*, that readers of commercial speech enjoy a lesser right to anonymity than readers of fully-protected speech. The commercial speech doctrine has developed in the context of government attempts to regulate speech itself, and appellant has cited no authority for the proposition that the doctrine gives rise to a symmetrical diminution in the right to read anonymously.

subpoenas. Much as with the subscriber information, we conclude that the speculative value of the purchaser information does not outweigh the burden that compelled disclosure would place on the First Amendment interests of the individuals identified. Although it is possible that the Report contained false or misleading information, the Commissioner has the Report and can evaluate the statements made therein without requiring Agora to reveal the identities of the purchasers. The investigation into the Email and Report began with a complaint from a disgruntled purchaser, suggesting that such persons are capable of coming forward if they wish their identities known.[13]

The Commissioner raises the possibility that Agora might have provided brokerage services in connection with the Report—that certain purchasers could have placed their orders for USEC stock with brokers recommended by Agora or in which Agora owned a financial interest. The Commissioner provides no basis for this allegation, however, beyond the general suspicion that Agora may be providing unregistered brokerage services in other contexts, and her interpretation of some Agora advertising materials as "suggest[ing] that subscribers receive different levels of service depending on how much they are willing to spend." The Commissioner has nowhere indicated that the sole consumer complaint concerning the Report contained any allegation of offers by Agora to broker transactions in USEC stock. Thus, while learning the identities of those who purchased the Report would be useful in investigating whether those persons were offered brokerage services, the Commissioner's suspicions in this regard lack any

---

**13.** The record indicates that the purchaser in question traded USEC stock after receiving the Report. We therefore do not decide whether the Commissioner would have a compelling interest in learning purchaser identities if she had no other means of investigating investor reliance. Resolving this issue would require us to consider an underlying question of Maryland securities law: whether investor reliance must be proven in order to establish securities fraud under § 11–301. We shall not consider such an important issue of securities law, one not necessary to the decision in the instant case, which is not a prosecution or enforcement action under § 11–301, and one not briefed or argued.

meaningful foundation. Such speculation cannot form the basis for a substantial relation to a compelling state interest that would justify invading the First Amendment's sphere of protection over the purchasers' anonymity. Agora cannot be compelled to produce the purchaser information.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY AFFIRMED. COSTS TO BE PAID BY AP-PELLANT.*