**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 06-1509

_____

SHERWOOD BRANDS, INCORPORATED, To its own use
and to the use of Asher Candy, Inc.,

Plaintiff - Appellant,

versus

LEONARD LEVIE; ELEANOR LEVIE,

Defendants - Appellees.

_____

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.   Richard D. Bennett, District Judge.
(8:03-cv-01544-RDB)

_____

Argued:  October 30, 2007          Decided:  December 28, 2007

_____

Before WILLIAMS, Chief Judge, TRAXLER, Circuit Judge, and Louise W.
FLANAGAN, Chief United States District Judge for the Eastern
District of North Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Albert David Brault, BRAULT GRAHAM, L.L.C., Rockville,
Maryland, for Appellant.  Nathaniel Edmond Jones, Jr., Baltimore,
Maryland, for Appellees.  **ON BRIEF:** Daniel Leonard Shea, Joan F.
Brault, BRAULT GRAHAM, L.L.C., Rockville, Maryland, for Appellant.
James H. Fields, JONES & ASSOCIATES, P.C., Baltimore, Maryland, for
Appellees.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This action arises out of a Merger and Acquisition Agreement between Sherwood Brands, Inc. ("Sherwood") and Asher Candy, Inc. ("Asher"). Sherwood asserts state law claims for securities violations, fraud and declaratory relief against Leonard Levie ("Leonard"), a member of Asher's Board of Directors, and Leonard's sister Eleanor Levie ("Eleanor"), Asher's majority shareholder. Eleanor asserted counterclaims against Sherwood for breach of contract and specific performance.[1] After conducting a nonjury trial, the district court entered judgment against Sherwood on its claims and in favor of Eleanor on her counterclaims. We affirm.

I.

In 1997, Leonard's company American Industrial Acquisition Corp. ("AIAC") purchased Asher, a candy cane manufacturer, which was in financial distress at the time. Leonard transferred Asher stock to Eleanor that gave her a 55% ownership interest in the company; he gave the remaining shares to other individuals and ultimately retained no ownership interest in Asher. Both before and after AIAC acquired Asher, James Spampinato served as Asher's President and CEO, and he held a significant ownership interest in Asher. Although Leonard retained no stake as a shareholder in the

_____

[1]Leonard also asserted counterclaims against Sherwood that are not at issue on appeal.

company and was not involved in its daily operations, he served on Asher's Board of Directors and eventually became Chairman, a position he filled from 1997 to April 2002.

In 2001, Asher again encountered financial difficulties in the wake of a pre-tax loss of $800,000 that year, prompting Leonard and Spampinato to seek a purchaser for the company. Through a business broker, Asher identified Sherwood, a manufacturer of confectionary products, as a natural fit. In January 2002, representatives of Sherwood, including its CFO Christopher Willi, traveled to Asher's New York plant to meet with Leonard and Spampinato. Financial materials presented to Sherwood projected a profit for Asher of $1 million for the fiscal year of 2002. Asher's significant losses in 2001 were disclosed during the meeting as well. After a number of meetings, Sherwood and Asher agreed upon a purchase price for Asher of $1.75 million, contingent upon the satisfactory completion of a due diligence review of Asher's financial condition by Sherwood.

Willi was in charge of Sherwood's due diligence review, and he enlisted the assistance of tax accountants and outside legal counsel. Willi and other Sherwood representatives visited Asher's New York office, where they were given access to tax records and insurance policies as well as other information about Asher. The information was provided by Asher employees who participated in the day-to-day operations of Asher; Leonard was not involved in any aspect of the due diligence process.

On April 25, 2002, Asher and Sherwood closed the transaction by executing the Merger Agreement. The final purchase price was $2 million, consisting of a "stock for stock" exchange in which Asher shareholders would receive a pro rata share of Sherwood stock in the total amount of $1.75 million plus "warrants to acquire such number of Sherwood shares as would have a fair market value of $250,000." J.A. 111. The Merger Agreement contained a "Post-Closing Adjustments" provision directing that Spampinato assist Willi "in the management of the Closing Date accounts payable and accrued expenses," and that representatives of Asher and Sherwood "work together to prepare and deliver a balance sheet . . . of the Closing Date Net Worth." J.A. 1734. As security for the post-closing adjustments anticipated by the parties, section 1.11 of the Merger Agreement directed that $700,000 of the Sherwood stock (the "Hold Back Shares") be placed in escrow.

Article II of the Merger Agreement set forth numerous "Representations and Warranties" that, according to Sherwood, turned out to be false. Under the terms of the Merger Agreement, however, Sherwood acknowledged and agreed that it "is an informed and sophisticated participant in the transactions contemplated herein, and has engaged advisors, experienced in the evaluation and purchase of enterprises such as the corporation." J.A. 1753.

Not long after closing, Sherwood learned information that reflected negatively on Asher's financial condition and potentially

4

reduced Asher's value.  For example, there was a $188,486 spike in Asher's accounts payable, purportedly resulting from incorrect data entry into Asher's computer system relating to outstanding invoices.  Asher's accounts receivable decreased by $67,000 as a result of customer deductions for quality problems.  Sherwood also learned that Asher underpaid payroll taxes by about $67,000 and that Leonard's company, AIAC, paid certain health care premiums for Asher in March 2002, and sought repayment of this "loan" in the amount of $51,000.  And, Sherwood contended that there was an undisclosed shortfall in Asher's 401(k) plan funding.  Willi conceded that, except for the underpaid taxes which came to light only after closing, Sherwood could have discovered all of the adverse information prior to closing the merger during its due diligence review.

The parties experienced difficulty in preparing the Closing Date Balance Sheet.  In November 2002, the parties entered into a Purchase Price Adjustment Agreement (the "PPAA"), as contemplated by the Merger Agreement, to address the disposition of the Hold Back Shares in light of the information learned by Sherwood after closing.  The PPAA provided that Asher's shareholders, the sellers, would receive $300,000 of the Hold Back Shares and that Sherwood would receive $200,000 of the Hold Back Shares.  The PPAA kept the remaining Hold Back Shares, worth $200,000, in escrow.

Finally, shortly before the PPAA was fully executed, Eleanor notified Sherwood that she intended to exercise her "Put Right" under section 4.3 of the Merger Agreement, which afforded each Asher shareholder, on the anniversary date of the Merger Agreement, "the right to sell [back] to [Sherwood] one-half of the Purchase Price Shares issued to him . . . at a price of $4.50 per share" if the value of Sherwood stock fell below $4.50 per share at that time. J.A. 1754. Additionally, section 4.3 provided that if Sherwood, through no fault of the sellers, failed to obtain an effective SEC registration statement for the purchase shares within six months of the closing, the Put Right would commence at six months rather than one year.

When Sherwood failed to obtain the registration statement within six months, Eleanor and other sellers gave notice of their intent to exercise their Put Rights. Sherwood, however, refused to honor Eleanor's Put Right on the grounds that registration had been prevented by the shareholders' failure to provide necessary information in a timely fashion as well as Asher's delay in providing a closing balance sheet. On April 24, 2003, the day before the sellers' one-year Put Rights became effective, Sherwood filed this action. Shortly thereafter, and more than one year after closing, Eleanor attempted to exercise her Put Right based on the value of the stock. Sherwood refused to honor the request.

Sherwood seeks relief under Maryland's Blue Sky law, which imposes civil liability upon any person selling a security "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made . . . not misleading." Md. Code Ann., Corps. & Ass'ns § 11-703(a)(1)(ii). The statute also imposes "control person" liability upon "[e]very person who directly or indirectly controls a person liable under [§ 11-703(a)]." Md. Code Ann., Corps. & Ass'ns § 11-703(c)(1). Because there was no evidence that Eleanor personally made any representations to Sherwood, the district court concluded that she could not be individually liable under the statute. The district court also rejected Sherwood's securities fraud claim against Leonard, concluding that Sherwood could not have reasonably or justifiably relied on any of the defendants' allegedly false statements or omissions of fact.

We affirm the district court's ultimate conclusion that neither Eleanor nor Leonard is liable under the statute, although we do so on alternative grounds with respect to Leonard. The Maryland Court of Appeals has yet to decide whether justifiable reliance is an element of a securities fraud claim, cf. Lubin v. Agora, Inc., 882 A.2d 833, 848 n.13 (Md. 2005) (reserving for another day the question of "whether investor reliance must be

7

proven in order to establish securities fraud under § 11-301"), and we will not attempt to answer this question of Maryland law here.

Nevertheless, we affirm the result reached by the district court on the alternative basis that Leonard is not liable as a "control person" under § 11-703(c). Control person liability rests on the liability of the seller, i.e., the person being controlled, under § 11-703(a). See Baker, Watts & Co. v. Miles & Stockbridge, 620 A.2d 356, 369-70 (Md. Ct. Spec. App. 1993) (holding that action could not proceed for contribution for joint and several liability under § 11-703(c) where there was no judgment against the principal seller). Leonard can be liable only "to the same extent as the person liable" under subsection (a). Md. Code Ann., Corps. & Ass'ns § 11-703(c)(1). Sherwood contends that Leonard was a "control person" based on his capacity as Chairman of Asher's Board of Directors and his lead role in the merger negotiations. Leonard's liability under § 11-703(c) cannot rest on his alleged control of Asher, however, because Asher was not the seller under the terms of the Merger Agreement -- the shareholders were the sellers. Thus, Sherwood's only potentially viable "control person" theory would be premised on Eleanor's liability as a seller under § 11-703(a); however, this theory is flawed as well. Because Eleanor was merely a passive shareholder who did not make any representations or otherwise participate in the merger negotiations in any way, the district court rejected Sherwood's claim against

8

Eleanor under § 11-703(a).  In light of these circumstances, we hold that Leonard is not subject to liability under § 11-703(c).[2]

B.

Sherwood asserts a state law fraudulent inducement claim, suggesting that it was induced to enter into the Merger Agreement as a result of false representations made by the defendants.  See Maryland Environmental Trust v. Gaynor, 803 A.2d 512, 516 (Md. 2002) (setting forth the elements of a fraudulent inducement claim).  Each element of a fraudulent inducement claim under Maryland law must be established by clear and convincing evidence.  See VF Corp. v. Wrexham Aviation Corp., 715 A.2d 188, 193 (Md. 1998).  The district court found that Sherwood failed to provide clear and convincing evidence that "it had the right to rely on any of the alleged misrepresentations made by Leonard Levie" or that "any of the alleged misrepresentations or omissions were made or withheld by Leonard Levie with the requisite deliberate intent to deceive."  J.A. 129.  We conclude that the factual findings of the district court are not clearly erroneous, and we affirm on the reasoning of the district court.

---

[2]Sherwood also contends that Eleanor is vicariously liable for Leonard's fraudulent conduct.  This argument must fail because Leonard did not make any fraudulent statements for which Eleanor might be held vicariously liable.

9

Sherwood seeks a declaratory judgment voiding the "Put Rights" provision in the Merger Agreement. This claim rests essentially on the same theoretical basis as the fraudulent inducement claim. That is, were it not for the misrepresentations of the defendants, Sherwood would not have entered into the Merger Agreement in the first place. In response, Eleanor brought counterclaims against Sherwood for breach of contract as to the Put Rights provision and for specific performance of the Put Rights provision. The district court concluded that because Sherwood failed to establish that the defendants engaged in securities fraud or fraudulently induced the Sherwood-Asher merger, there was no basis for it to afford Sherwood the declaratory or injunctive relief it sought.

By contrast, the district court found that Eleanor established her counterclaim for breach of contract. The district court reasoned that "Sherwood did not honor Eleanor Levie's Put Right, in part, because it attributed its failure to have an effective registration statement six months after closing to the Sellers," but that "under Section 4.3 [of the Merger Agreement] such a failure to register the shares simply does not affect the vesting of the put right afforded to the Sellers at the one year anniversary of the Merger, which has since passed." J.A. 133-34. Thus, the district court concluded that Sherwood was "contractually obligated to honor Section 4.3 of the Merger Agreement," that

10

Sherwood's failure to do so constituted a breach of the Merger Agreement, and that Eleanor "is entitled to specific performance, . . . result[ing] in Sherwood owing Eleanor $296,552.25." J.A. 134.[3] Finding no reversible error, we affirm the district court's rulings on all of the claims relating to Eleanor's Put Rights for the reasons stated by the district court.

We have reviewed Sherwood's remaining arguments in light of the record and the findings of the district court and conclude that they are without merit.

## III.

Accordingly, we affirm the decision of the district court.

AFFIRMED

---

[3]Sherwood moved to alter or amend the judgment, arguing that Eleanor was not entitled to specific performance because she was in material breach of the Merger Agreement. The district court denied the motion, finding that Sherwood had not asserted a breach of contract claim against Eleanor or pursued such a theory at trial. We affirm the district court's order for the reasons set forth therein.