Dear Bonnie A. Kirkland
On behalf of the Article Review Committee reviewing the code revision draft of Article 49B of the Annotated Code of Maryland, you have requested our opinion concerning § 6 of that article, which makes it a crime for an individual to receive "any remuneration of any kind whatsoever" for participating in a "racial demonstration." The Committee asks whether that provision is constitutional and whether its repeal would have any substantive effect.
In our opinion, a court would likely hold that an attempt to enforce the statute would violate the First Amendment of the United States Constitution, as well as Article 40 of the Maryland Declaration of Rights. Accordingly, we recommend that the General Assembly repeal § 6 when it revises Article 49B.
 I Article 49B, § 6 A. Statutory Language
The statute reads, in its entirety, as follows:
 (a) It is unlawful for any person to receive any remuneration of any kind whatsoever for participation in any racial demonstration in the State.
 (b) Violation of this section is punishable upon conviction by fine not to exceed $1,000 or by imprisonment not to exceed one year or by both fine and imprisonment. *Page 155 
Annotated Code of Maryland, Article 49B, § 6.[1] We are not aware of any cases prosecuted under this statute or any court decisions construing it.[2] Nor is there any extant legislative history. However, the historical record provides some insight into the statute's meaning and purpose.
B. Historical Context 1. Public Accommodations and Demonstrations
Civil rights demonstrations and protests preceded the enactment of major federal and State civil rights legislation, including Article 49B, during the 1960s. Many of the early protesters were inspired by religious values and were committed to non-violence. Some engaged in non-violent civil disobedience, such as sit-ins, to protest segregation laws. See Taylor Branch, Parting the Waters: America in the King Years1954-63 (1988) ("Parting the Waters") at 204-5, 272-76.
Protests in the early 1960s targeted racial discrimination in public transportation and public accommodations, such as hotels and restaurants. Those engaging in the protests often received financial support from others. For example, the expenses of participants in the "freedom rides" protesting segregated interstate buses and bus stations in several southern states were financed in part by donations.Parting the Waters at 489-90.[3] *Page 156 
Demonstrations in support of the movement to desegregate public accommodations also occurred in Maryland. After several incidents in which restaurants in Maryland refused to serve diplomats from newly independent African nations in the early 1960s, various national civil rights groups, including the organizers of the freedom rides, pressured the Maryland Governor and Legislature to enact a statewide law banning racial discrimination in public accommodations. Peter B. Levy, Civil Waron Race Street: The Civil Rights Movement in Cambridge, Maryland (2003) ("Civil War on Race Street") at 36. Veterans of the original freedom rides came to Maryland and focused on facilities along Route 50, particularly in the city of Cambridge. Civil War on Race Street
at 38-40. In 1962, demonstrations began in Cambridge; among the leaders of those protests were students and other individuals described as "outside agitators" by local officials. Civil War on Race Street at 40-41. At least one theater in the town reacted by enforcing a more restrictive segregation policy. In March 1963, students and others led a series of demonstrations from local churches. Civil War on Race Street at 76. Crowds opposed to desegregation confronted the demonstrators and many arrests followed.
By June 1963, some demonstrations were accompanied by violence. The Governor declared martial law in the town and sent in the National Guard. Civil War on Race Street at 83. In a July 1963 agreement brokered by United States Attorney General Kennedy, town officials pledged to undertake various reforms, including desegregation of public accommodations, in return for a halt to demonstrations. Civil War onRace Street at 86-88. *Page 157 
However, a referendum at a special town election later that year repealed the local desegregation measure for public accommodations.Civil War on Race Street at 102.
2. Maryland Public Accommodations Law
Against this background, the General Assembly dealt with the issue of desegregation of public accommodations. It passed, during its 1963 session, a public accommodations law barring discrimination on the basis of race, creed, color, or national origin in hotels, restaurants, and other places of public accommodation.[4] Chapters 227, 228, Laws of Maryland 1963, codified at Annotated Code of Maryland, Article 49B, § 11 et seq.[5] The new law also gave certain enforcement powers to the Commission on Interracial Problems and Relations, the predecessor of the Maryland Commission on Human Relations.[6] Id. However, eleven counties, including the entire Eastern Shore, were excepted from the purview of the 1963 law and the Commission's enforcement authority.
The next year, during a special session, the Legislature amended the new anti-discrimination law to eliminate the geographical exceptions and extend it statewide. Chapter 29, First Special Session, Laws of Maryland 1964. However, as the bill went through the legislative process, a provision concerning "racial demonstrations" was added to the bill. In particular, a new § 11A, the predecessor of current § 6, was added to prohibit the receipt of remuneration for participation in "any racial demonstration."[7] A contemporary press account of the legislative negotiations reported that this provision was added at the request of Eastern Shore *Page 158 
opponents of the statewide public accommodations measure as the Governor and legislative leaders sought to assemble the votes necessary for its passage. See C. Whiteford, Tawes calls action `great step forward inracial relations,' Baltimore Sun, p. 1, 14 (March 15, 1964).[8] The statewide law was petitioned to referendum, and was narrowly ratified by the voters at the 1964 election.[9] See Maryland Manual 1965-1966 at 484.
 II Analysis
A. What the Statute Prohibits
The first subsection of the statute regulates conduct; the second establishes a criminal penalty for a violation. The statute prohibits receipt of "remuneration" for participation in an event characterized as a "racial demonstration." An understanding of the meaning of those terms is necessary to measure the statute against constitutional limitations.
1. "Remuneration"
The Legislature has used the word "remuneration" frequently in the Annotated Code, generally in contexts in which it intends to encompass not only monetary compensation, but also any type of reward or consideration paid to the party in question. See, e.g., Annotated Code of Maryland, Health-General Article, § 7-1104(a) (State employee may not receive or solicit "any remuneration" other than State compensation for providing certain services); Insurance Article, § 10-503(b) (insurance adjuster may not accept any "form of *Page 159 
remuneration" from a repair service for recommending that service to an insured); Natural Resources Article, § 4-701(i)(3)(ii) (fishing license may not be transferred "for any type of remuneration"); Article 2B, § 15-112(d)(6) (members and employees of Baltimore City liquor board may not receive "any commission, remuneration or gift whatsoever" from licensees or manufacturers of alcoholic beverages).
In Article 49B, § 6, the General Assembly eliminated any doubt that it was using the term in its broadest possible meaning by surrounding it w ith expansive adjectives — i.e., "any remuneration of any kindwhatsoever." For example, the term would clearly apply to living expenses or a stipend paid to a student or other "outside agitator" who visited the State to participate in a "racial demonstration."
2. "Racial Demonstration"
The phrase "racial demonstration" has fallen out of use in the 21st century. An on-line search of the New York Times archive found no use of the phrase in that newspaper after 1971. However, in the early 1960s it was often used as a synonym for "civil rights protest" or "civil rights demonstration" when the focus of the demonstration or protest was racial segregation or racial discrimination. Court decisions from that period concerning civil rights protests, particularly in the United States Court of Appeals for the Fourth Circuit, often use the phrase. See, e.g., Baines v. City ofDanville, 337 F.2d 579, 582, 586 (4th Cir. 1964) (in cases "arising out of racial demonstrations in Danville, Virginia," discussing whether demonstrators had exceeded their First Amendment rights); see also Knight v. State Board of Education, 200 F. Supp. 174,181 (M.D.Tenn. 1961) (discussing whether plaintiff college students had been disciplined for engaging in "racial demonstrations" —i.e., freedom rides — in Mississippi).
The phrase "racial demonstration" relates to the message that the demonstrators intended to convey, as opposed to the manner in which the demonstration was conducted or the identity of the demonstrators. As best we can determine from the contemporary sources, the phrase does not connote a violent demonstration as opposed to a peaceful one, or a demonstration at which civil disobedience was practiced as opposed to one in which the demonstrators acted entirely within the restrictions of the then-current law. Nor does it necessarily refer to the race of the *Page 160 
demonstrators — many of the freedom riders were white.[10] Rather, it refers to the subject matter of the protest.
Thus, it is a fair inference that the General Assembly used the phrase in reference to demonstrations protesting racial discrimination.
3. Summary
In our view, the language of the statute prohibits anyone who participates in a demonstration or protest against racial discrimination from receiving anything of value for that participation. It is evident that its purpose was to limit participation in civil rights demonstrations by individuals who might require some financial support in order to participate — e.g., students and other "outside agitators" blamed by some for unrest accompanying some demonstrations.
B. Whether the Statute is Constitutional 1. Assessment of Constitutionality in an Attorney General Opinion
The Committee has asked whether § 6 is constitutional. In undertaking this analysis, we are mindful of the obligation of the Attorney General to defend, in litigation, the constitutionality of statutes enacted by the L egislature. State v. Burning Tree Club, Inc., 301 Md. 9, 36-37,481 A.2d 785 (1984). However, we also have an obligation under Article V, § 3(a)(4) of the State Constitution to respond to inquiries from the Legislature with our best legal analysis — an obligation recognized in the Burning Tree decision itself. 301 Md. at 34. In the current setting where there is neither pending nor imminent litigation concerning § 6, [11] we do not act as the advocate for the provision before a tribunal. Rather, we are asked by an arm of the Legislature to assess the constitutionality of its own enactments, indulging all of the presumptions in favor of, and against, the statute that a court would consider. *Page 161 
In that regard, § 6 is to be given the benefit of the doubt. There is a presumption in favor of the constitutionality of a statute, [12] and statutes should be construed to avoid constitutional defects. In reRoberto d.B., 399 M d. 267, 283-84, 923 A.2d 115 (2007). How ever, the canons of statutory construction do not authorize a court, or an opinion of the Attorney General, to rewrite a statute to make it constitutional. Accordingly, any construction of the statute must be reasonable in light of its language and underlying purpose. Davis v. State, 294 Md. 370,377-78, 451 A.2d 107 (1982).
Of course, even if we conclude that the statute is constitutionally deficient, an Attorney General opinion cannot itself invalidate an act of the General Assembly. Burning Tree, 301 Md. at 36. However, as the legal counsel for the State, we advise our clients, particularly those who have sworn to uphold the federal and State constitutions, [13] to administer statutes in compliance with constitutional provisions.See, e.g., 71 Opinions of the Attorney General 266 (1986) (debarment statute unconstitutional and unenforceable in light of Supreme Court decision concerning similar statute); 62 Opinions of the AttorneyGeneral 227 (1977) (provision of budget bill restricting State employee speech was unconstitutional and should not be implemented); 56Opinions of the Attorney General 25 (1971) (recommending that the General Assembly amend the Maryland Constitution to delete a provision prohibiting ministers or preachers from serving in Legislature as the provision was invalid under First and Fourteenth Amendments of the federal constitution); 46 Opinions of the Attorney General 51 (1961) (statutes requiring segregation of three juvenile reform schools should not be implemented in light of Court of Appeals decision holding that segregation pursuant to a different statute at a fourth institution was unconstitutional). *Page 162 
 2. Freedoms of Speech and Association
As outlined above, Article 49B, § 6, essentially criminalizes the receipt of funds — or other remuneration — by an individual for that individual's participation in a civil rights demonstration. While the action regulated by the statute is the payment of funds or other remuneration, its stated purpose is to restrict that activity only in connection with a particular form of expressive activity — a demonstration against racial discrimination or, in the parlance of the 1960s, a "racial demonstration."
The statute must be assessed against the constitutional provisions that protect the freedoms of speech and association. Those rights are based on the First Amendment of the United States Constitution, as well as Article 40 of the Maryland Declaration of Rights.[14] Organized expression of views on public issues is on the "highest rung of . . .First Amendment values." NAACP v. Claiborne Hardware Co., 458 U.S. 886,913 (1982). Nevertheless, the government may regulate that right if it has "a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." Buckley v.Valeo, 424 U.S. 1, 25 (1976). A statute that is not narrowly tailored and that includes a substantial amount of constitutionally protected conduct within its prohibition may be struck down on the basis of overbreadth and vagueness.[15] See United States v. Williams, ___ U.S. ___, 128 S.Ct. *Page 163 
1830, 1838, 1845 (2008); Cox v. Louisiana, 379 U.S. 536, 551-52 (1965);NAACP v. Button, 371 U.S. 415, 432-33 (1963).
3. Brookins
The Court of Appeals recently assessed the constitutionality of a State statute of similar vintage that criminalized the payment of compensation for participation in speech-related activities. State v.Brookins, 380 Md. 345, 844 A.2d 1162 (2004). That case concerned a statute, most recently codified at Annotated Code of Maryland, Election Law Article ("EL"), § 13-245, that prohibited candidates, political committees, political parties, and others from paying "any sum of money or thing of value" for "walk around services" on election day. The statute defined "walk around services" to include such activities as distributing campaign material, electioneering or canvassing, and communicating a voting preference. EL § 13-245(a). Certain types of payments were excepted from the prohibition, including salaries of campaign personnel, the cost of transporting voters to polling places, meals served to campaign workers, and similar items. EL § 13-245(b).
Brookins arose out of a criminal prosecution of several individuals who had paid college students and residents of homeless shelters to provide "walk around services" on election day in 2002, including the distribution of campaign materials and electioneering with voters near polling places. The defendants moved to dismiss the indictment, challenging the constitutionality of the statute under both theFirst Amendment of the United States Constitution and Article 40 of the Maryland Declaration of Rights. The circuit court dismissed the indictment on the ground that the statute was facially unconstitutional.
The Court of Appeals analyzed the arguments under the federal and State constitutional provisions as a single issue. 380 M d. at 350 n. 2.[16] The Court first observed that, under Supreme Court precedents, a law that burdens "core political speech" is subject to "exacting scrutiny" and may be upheld only if it is narrowly tailored to serve an important State interest. 380 Md. at 355. The Court described in detail several Supreme Court decisions striking down restrictions on campaign expenditures and similar payments on First Amendment grounds.See, e.g., Meyer v. Grant, 486 U.S. 414 (1988) (holding that state statute that prohibited compensation of *Page 164 
petition circulators violated First Amendment);[17] Buckley v.Valeo, 424 U.S. 1 (1976) (striking down federal restrictions on campaign expenditures).
In defending the statute, the State argued that the statute was directed not at political speech itself, but at the potentially corrupt use of money to influence an election and that, to the extent it affected speech, the statute was content-neutral. The State also argued that the statute was narrowly focused on payments for very specific electioneering activities on a single day — election day. Id. at 360-61, 370-71.
The Court held that the statute regulated speech and found none of the State's arguments sufficiently compelling to save the statute. In rejecting the argument that the statute did not regulate speech perse, the Court observed that the Supreme Court had applied a stricter standard to regulation of campaign expenditures as opposed to regulation of campaign contributions. 380 Md. at 361-68. It noted that, as inBuckley, the statutory restriction on payments for "walk around services" directly affected a candidate's ability to disseminate a political message, as those activities were part of conveying that message. Id. at 368-69. The Court also rejected the State's argument that the statute was content-neutral, noting that the Supreme Court has stated that "the First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic." 380 Md. at 369
(quoting Burson v. Freeman, 504 U.S. 191, 197 (1992)).
The Court stated that there was no showing that the statute was necessary to accomplish the goal of reducing corruption, and cited other statutes that directly prohibit vote-buying, attempts to influence voters through the use of force or other improper means, and interference with the balloting process. Id. at 373-74. The Court concluded that "[t]he State's asserted goal of preventing corruption or the appearance of corruption does not rise to the level of a compelling state interest in light of the fact that the measure `restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication.'" Id. at 375-76 (quoting Meyer v. Grant). *Page 165 
 4. Application to § 6
As noted above, while § 6 literally prohibits certain payments, like the statute in Brookins, it concerns payments only for certain types of expressive activity — "racial demonstrations." Thus, like the statute barring payments for "walk around services," it indirectly regulates speech. But it is even more difficult than in Brookins to argue that the restriction on speech in § 6 is content-neutral. While the restrictions on payments for "walk around services" applied to all candidates and political parties, regardless of their point of view, § 6 targets demonstrations protesting racial discrimination. There is no similar prohibition on receiving remuneration for participation in a demonstration for or against a war, abortion, other forms of discrimination, or other issues of public policy.
It might be argued that § 6 was designed not to limit the participation of those who wish to express a particular point of view, but simply to eliminate those who participate in a demonstration for profit without any true interest in the issue of racial discrimination. Assuming that the statutory language could be parsed to reach such a conclusion and that a category of mercenary protesters could be identified, enforcement of the statute would still violate theFirst Amendment. In Meyer, supra, the Supreme Court struck down a statute in a case involving the hiring of petition circulators by proponents of a possible ballot measure; in Brookins, the statute was held unconstitutional when payments were made to residents of an out-of-state homeless shelter recruited to electioneer with voters.
It might also be urged that § 6 was a prophylactic measure designed to prevent demonstrations that would result in violence or other violations of the law. However, the language of § 6 makes no distinction as to whether the forbidden remuneration is for participation in an entirely lawful demonstration, a protest involving civil disobedience, or one accompanied by violent activity. Nor does it target any particular type of participation — it covers peaceful presence as well as incitement to violence. As noted above, it would encompass financing the transportation expenses of someone who travels to participate peaceably in a civil rights march. Nor is there any apparent way to limit the reach of the statute by its historical context. In the parlance of the early 1960s, a "racial demonstration" could be, and generally was, an entirely lawful activity in which the participants expressed their common political and moral views. The broad reach of the statute not only undermines any argument that it is narrowly tailored to serve an important governmental interest; it also demonstrates that the statute is fatally overbroad. *Page 166 
There is simply no way to parse the broad language of this statute to limit its application to situations in which the compensated "participation" is not protected speech. Accordingly, in our view, § 6 cannot be enforced consistently with the First Amendment of the United States Constitution or Article 40 of the Maryland Declaration of Rights.
5. Severability
In light of our conclusion that § 6 is unconstitutional, we discuss briefly whether the invalidity of § 6 would call into question the validity of the rest of the 1964 act, including the statewide public accommodations law. In other words, is the current § 6 severable from the remainder of the public accommodations law? In our view, the provision is severable.
At the time § 6 was originally enacted, as now, the courts did not generally invalidate an entire act when a portion of the act was held unconstitutional or preempted by other law. See, e.g., City of Baltimorev. Stuyvesant Insurance Co., 226 Md. 379, 390-93, 174 A.2d 153 (1961). Rather, the courts generally looked to whether the remaining valid provisions alone were incomplete or incapable of being executed in accordance with legislative intent — an approach that was codified in statute in 1973. See Annotated Code of Maryland, Article 1, § 23.
In this instance, § 6 does not relate directly to the enforcement of the statewide public accommodations law, as it regulates a category of public events rather than a category of accommodations; the public accommodations law functions independently of § 6. While the inclusion of § 6 in the 1964 act may have been important to the passage of that law, the provisions have not been linked in subsequent legislation reaffirming the anti-discrimination measure. The Legislature has amended and reenacted the public accommodations statute on numerous occasions since 1964. For example, it has reenacted the public accommodations law to expand the types of prohibited discrimination, without making similar changes to § 6. It is evident that, whatever purpose § 6 served in the original passage of the public accommodations law, the legislative intent underlying the subsequent reenactments of the antidiscrimination law would require that § 6 be severed.[18] *Page 167 
 III Conclusion
In our opinion, a court would likely hold that an attempt to enforce Article 49B, § 6, would violate the First Amendment of the United States Constitution, as well as Article 40 of the Maryland Declaration of Rights. Accordingly, we recommend that the General Assembly repeal § 6 when it revises Article 49B.[19]
 Douglas F. Gansler Attorney General
 Robert N. McDonald Chief Counsel Opinions and Advice
[1] This statute was originally enacted as § 11A of Article 49B. Chapter 29, First Special Session, Laws of Maryland 1964. Some years later, it was recodified in its current location without any change in language. Chapter 684, § 2, Laws of Maryland 1978.
[2] A search of Westlaw yielded no similar statutes in other states or any cases construing a similar statute.
[3] Branch describes the dramatic circumstances of one decision to finance such demonstrations in 1961 after the first group of freedom riders had been beaten in South Carolina and Alabama:
 . . . That evening with the divided Nashville adults agreeing to donate $900 from the sit-in treasury without explicitly endorsing the student plan, Diane Nash [of the Nashville student movement] pushed ahead with a call of final notice to [Rev. Fred] Shuttlesworth [of the Southern Christian Leadership Conference]. "The students," she told him, "have decided that we can't let violence overcome. We are going to come into Birmingham to continue the Freedom Ride."
 "Young lady," Shuttlesworth replied in his most authoritative voice, "do you know that the Freedom Riders were almost killed here?"
 "Yes," Nash said tersely. . . . "That's exactly why the ride must not be stopped. . . ."
Parting the Waters at 430.
[4] An exception for bars and taverns in the original law was removed a few years later. Chapter 484, Laws of Maryland 1968.
[5] The federal law prohibiting racial discrimination in public accommodations was passed the following year as Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq.
[6] The name was changed in 1968. Chapter 83, Laws of Maryland 1968.
[7] In addition, a proviso was added to the bill that allowed proprietors to deny service to a person based on "the usual and regular requirements, standards and regulations for the establishment" so long as the denial was not based upon prohibited discrimination. That provision is currently codified as Article 49B, § 5(c).
[8] Contemporary press accounts are sometimes relied upon by the courts to provide useful context for laws enacted prior to the compilation and preservation of legislative files in the mid-1970s.In re Jason W, 378 Md. 596, 602 n. 3, 607-11, 837 A.2d 168
(2003).
[9] The history of Maryland's public accommodations law is discussed in Bell v. Maryland, 378 U.S. 226, 228-29 n. 1 (1964), in which the Supreme Court held that the passage of that law put in question criminal trespassing convictions of students who had engaged in a sit-in to protest racial discrimination prior to passage of the law. The lead defendant in that case later became the current Chief Judge of the Court of Appeals of Maryland.
[10] Parting the Waters at 390 (describing the organization of the freedom riders as "an interracial cadre of people well trained in nonviolence").
[11] The Office of the Attorney General has long had a general policy of declining to provide formal opinions when there is pending or imminent litigation concerning the issue in question.
[12] Similarly, this Office applies a "not clearly unconstitutional" standard in reviewing bills passed by the General Assembly prior to their approval or veto by the Governor. 71 Opinions of the AttorneyGeneral 266, 272 n. 12 (1986). This standard of review reflects the presumption of constitutionality to which statutes are entitled and the Attorney General's constitutional responsibility to defend enactments of the Legislature, while also satisfying the duty to provide the Governor with our best legal advice.
[13] See Maryland Constitution, Article I, § 9.
[14] The Maryland provision states:
 That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege.
Maryland Declaration of Rights, Article 40. The Court of Appeals has stated that Article 40 is "in pari materia" with the First Amendment and that, while the two provisions will not necessarily always be construed identically, in many contexts, the analysis under Article 40 and theFirst Amendment will be the same. The Pack Shack, Inc. v. HowardCounty, 377 Md. 55, 64, 832 A.2d 170 (2003).
[15] The vagueness doctrine is derived from the constitutional right to due process — i.e., a law fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it permits discriminatory enforcement. Williams, 128 S.Ct. At 1845.
[16] See note 14 above.
[17] A similar prohibition in Maryland law had been held unconstitutional in Ficker v. Montgomery County Board of Elections,670 F. Supp. 618 (D.Md. 1985).
[18] It is also notable that the federal civil rights law barring racial discrimination in public accommodations, enacted after the Maryland statute, would cover most, if not all, the facilities covered by the State law. See 42 U.S.C. § 2000a.
[19] Changes made by code revision bills are generally presumed to clarify and not to make a substantive change in the law. See, e.g., Chapter 15, § 3, Laws of Maryland 2008; see also Allen v. State,402 Md. 59, 69-76, 935 A.2d 421 (2007). We recommend that the repeal either be accomplished in a separate bill or be specially flagged for the General Assembly in the code revision bill. See Maryland Division of Labor andIndustry v. Triangle General Contractors, Inc., 366 Md. 407,784 A.2d 534 (2001) (code revision bill may effect substantive change if language is clear and unambiguous). *Page 168